1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  SHARON L. O'GRADY (SBN 102356)
   CHRISTOPHER J. KISSEL (SBN 333937)
4  Deputy Attorneys General
    455 Golden Gate Ave., Suite 11000
5   San Francisco, CA 94102
    Telephone: (415) 510-3834
6   Fax: (415) 703-1234
    E-mail: Sharon.OGrady@doj.ca.gov
7  *Attorneys for Plaintiff California High-Speed Rail Authority*

8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| **CALIFORNIA HIGH-SPEED RAIL AUTHORITY,** | Case No. |
| Plaintiff, | |
| **v.** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **UNITED STATES DEPARTMENT OF TRANSPORTATION**; **SEAN DUFFY**, in his official capacity as Secretary of the Department of Transportation; **THE FEDERAL RAILROAD ADMINISTRATION**; **DREW FEELEY**, in his official capacity as Acting Administrator of the Federal Railroad Administration, | |
| Defendants. | |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      The California High-Speed Rail Authority ("Authority") brings this action for declaratory and injunctive relief challenging the Federal Railroad Administration's ("FRA") decision to terminate more than $4 billion in federal grant funding for the California high-speed rail program.  The high-speed rail program is the first project of its kind in the history of the United States: an all-electric railway on which trains will travel over 200 miles per hour across one of this Country's largest and most economically vital States.  It is also a crucial part of California's long-term strategic planning, not only to address critical transportation needs, but also greenhouse gas emissions and climate change, as well as to spur economic growth in California's Central Valley and across the State.

2.      The Authority and FRA have collaborated for more than 15 years on this historic program, and the State has committed more than $22 billion to it.  After initial federal grant awards in 2009 and 2010 totaling about $3.5 billion, federal grant funding ceased for several years.  That changed in 2022.  Between August 2022 and January 2025, FRA awarded additional grants totaling about $3.4 billion to the Authority for the section of the project in the Central Valley extending from Merced to Bakersfield.  The 171-mile Merced-to-Bakersfield section, also called the Early Operating Segment or EOS, will be the first part of the system to commence revenue service, carrying passengers between Bakersfield, Fresno, Madera and Merced.

3.      California has performed its obligations under the terms of the federal grants, and construction is well-advanced, furthering the goal of the Congressional appropriations that fund the grants.  In the initial 119-mile First Construction Segment (FCS), 55 major structures (viaducts, bridges, overpasses and undercrossings) have been completed and 30 more are under construction, with only eight not yet under construction.  Seventy miles of guideway for the laying of track have been completed, with 27 more underway; 99.3 percent of the parcels needed for right-of-way have been acquired; and 86 percent of utility relocations have been completed. The Authority is on schedule to commence passenger revenue service by 2033.

4.      President Trump has long expressed personal animus toward the California high-speed rail program.  On February 19, 2019—one day after California and fifteen other States filed

suit to invalidate President Trump's declaration of emergency at the southern border to advance his proposed border wall—President Trump took to Twitter to denigrate California, which led the suit, as "the state that has wasted billions of dollars on their out-of-control Fast Train, with no hope of completion."  One minute later, he posted that the "failed Fast Train project in California . . . is hundreds of times more expensive than the desperately needed Wall."  Later that same day, in a curt, three-page letter, FRA abruptly notified the Authority of its intent to terminate a cooperative agreement granting $929 million to California for the project (the "FY10 Cooperative Agreement"), described in more detail below.  On March 4, 2019, the Authority responded with a detailed, point-by-point refutation of the assertions in FRA's notice.

5.     Nevertheless, on May 16, 2019, FRA carried out its threat and announced its "final decision" to terminate the FY10 Cooperative Agreement and deobligate the grant funds.  FRA signaled its intent to reallocate the money to other inter-city rail projects.

6.     On May 21, 2019, the State of California and the Authority sued, seeking to set aside the termination decision and to enjoin FRA and the U.S. Department of Transportation from re-obligating the grant funds to another grantee or otherwise transferring the funds.  That lawsuit was ultimately resolved through a June 2021 settlement agreement re-obligating the full amount of the FY10 Cooperative Agreement and amending some of its terms.

7.     Since then, FRA and the Authority have entered into new Cooperative Agreements to help fund construction of the EOS.  The largest of them, the FSP Cooperative Agreement (described in more detail in paragraphs 46-48 below), was executed 10 months ago, in September 2024. Under the FSP Cooperative Agreement, FRA has obligated $2.4 billion to the project, and the Agreement provides for an additional $680 million that FRA has not yet obligated. Additionally, just eight months ago, in November 2024, FRA and the Authority agreed to amend the FY10 Cooperative Agreement, extending its end date from December 31, 2026, to January 31, 2030.

8.     Until now, at no time before or since FRA's abrupt termination decision in 2019 (which FRA itself later reversed) has FRA ever found the Authority to be in material breach of its obligations under any of the Cooperative Agreements.  FRA completed its last annual monitoring

1  review of the high-speed rail project on October 28, 2024, and at that time made no findings for

2  which corrective measures were needed, let alone major or persistent compliance lapses.

3     9.    Just days after President Trump began his second term, however, the President

4  began to attack the project once again. The President's assertions included statements that were

5  obviously untrue—he stated, for example, that the project was "hundreds of billions of dollars

6  over budget" (the total program budget is about $106 billion dollars, and the budget for the EOS

7  is about $27 billion) and that he had "read where you could take every single person that was

8  going to go in the train and get the finest limousine service in the world and take them back and

9  forth with limousines and you'd have hundreds of billions of dollars left over."  He added, "[Y]ou

10  take an airplane, it costs you two dollars.  It costs you nothing, you take an airplane. . . . [A]nd if

11  you have to drive, you can drive." The President stated that he intended to initiate an investigation

12  of the California high-speed rail project.

13     10.    On February 20, newly confirmed U.S. Department of Transportation Secretary

14  Sean Duffy stated that, in response to President Trump's call for an investigation, he would direct

15  FRA to initiate a review of the Authority's compliance with the terms of its federal funding

16  agreements.  "And we're going to look at whether California High-Speed Rail has actually

17  complied with the agreements they've signed [and whether] they [are] spending it per the

18  agreements that they made with the federal government."  He insinuated, without evidence, that

19  the project was riddled with fraud, waste or abuse, positing: "Who got rich?  What consultants?

20  What politicians? What politicians' husbands got rich off this money?"  The same day, the Chief

21  Counsel for FRA advised the Authority by letter that FRA intended to initiate a compliance

22  review of the FY10 Cooperative Agreement and the FSP Cooperative Agreement—even though

23  FRA had just completed an audit of the project and issued a clean report less than four months

24  earlier.

25     11.    On June 4, 2025, FRA sent the Authority a Notice of Proposed Determination

26  stating its intent to terminate the FY10 Cooperative Agreement and the FSP Cooperative

27  Agreement, which together total over $4 billion, and attaching a Compliance Review Report

28  dated June 2025.  *See* Exhibit A attached hereto.  Although the Cooperative Agreements do not

require initiation of revenue service on the EOS until December 31, 2033—more than eight years from now—FRA conjectured that the Authority would be unable to make that target.  FRA also stated that the Authority has no credible plan to address an approximately $7 billion shortfall in funding needed to complete the EOS.  In support of the latter conclusion, FRA grossly mischaracterized statements that the High-Speed Rail Authority's Inspector General made in a recent report.  Indeed, after FRA sent its notice, the Inspector General (or OIG-HSR) publicly disavowed FRA's characterization of those statements, writing that OIG-HSR has "never concluded that the lack of funding for certain components of the Merced-to-Bakersfield segment would prohibit the Authority from meeting its . . . commitments to the FRA" and that "we have identified no citations by the FRA supporting its assertion that the OIG-HSR ever made this conclusion."[1]  FRA also gave no credence to the Governor's May 2025 Budget Revision, which proposed a stable funding source of $1 billion per year for the high-speed rail program.  FRA simply assumed that the Legislature would not approve the request.  FRA demanded a response from the Authority within seven days.

12.    On June 11, 2025, the Authority provided an initial response in which it disputed the asserted grounds for termination.  *See* Exhibit B attached hereto.  As permitted by the Cooperative Agreements, the Authority also timely provided a more detailed supplemental response with supporting documentation on July 7, 2025.  *See* Exhibit C attached hereto.

13.    Just hours after the Authority produced its detailed supplemental response and documentation, and before any meaningful review of the submission would have been possible, the President stated that he told Secretary Duffy to "do whatever you can to stop it," and Secretary Duffy told reporters to "probably give us five days—and you'll have an answer on what's gonna happen with the 4 billion dollars that we have potentially on a train that's gonna go nowhere."

---

[1] OIG-HSR Letter to Governor Newsom, President pro Tempore of the Senate McGuire, and Speaker of the Assembly Rivas (June 10, 2025), available at: https://hsr.ca.gov/wp-content/uploads/2025/06/OIG-HSR-June-2025-FRA-Report-Response-Letter-A11Y.pdf ("OIG Response Letter").

14.     On July 16, 2025, FRA notified the Authority that it was terminating the Cooperative Agreements effective that day, based on its cursory conclusion that the Authority "will not be able to deliver operation of a Merced-to-Bakersfield by the end of 2033," and "this failure constitutes a Project Material Change under the FSP Agreement, and that the statutes under which the FY10 Agreement is authorized or funded would not be adequately served by the continuation of the federal contribution." *See* Exhibit D attached hereto.

15.     FRA's sudden decision to terminate the FY10 Cooperative Agreement and the FSP Cooperative Agreement was arbitrary and capricious, an abuse of discretion, and contrary to law, and threatens to wreak significant economic damage on the Central Valley, the State, and the Nation.

16.     For these reasons, and those discussed below, the Court should vacate and set aside FRA's action terminating the grants and deobligating more than $4 billion in federal funding for the project.  The Court also should enjoin Defendants from re-obligating and distributing these funds to any other recipient, or from otherwise transferring the funds.

## JURISDICTION, VENUE, AND INTRA-DISTRICT ASSIGNMENT

17.     This Court has subject matter jurisdiction under 28 U.S.C. sections 1331 and 2201.

18.     An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. section 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. sections 2201 and 2202.

19.     Venue is proper in this judicial district under 28 U.S.C. section 1391(e), because this is a civil action in which Defendants are agencies of the United States or officers of such an agency, no real property is involved in this action, and Plaintiff the California High-Speed Rail Authority resides in this judicial district.

## PARTIES

20.     Plaintiff the California High-Speed Rail Authority (the "Authority") is an instrumentality of the State of California and is responsible for developing and constructing a high-speed rail system in California.  The Authority is also the grantee under Cooperative

1    Agreements with FRA for constructing new intercity high-speed rail corridors and planning

2    future high-speed rail services.

3          21.    The Authority has standing to bring this action due to the loss of federal grant

4    funds caused by Defendants' wrongful conduct and the resulting delay in development of the

5    California high-speed rail system.

6          22.    Defendant United States Department of Transportation ("DOT") is the federal

7    agency to which Congress has appropriated the grant funds at issue in this case.

8          23.    Defendant Sean Duffy is the Secretary of DOT, oversees DOT, and is responsible

9    for the actions and decisions challenged in this action.  Defendant Duffy is sued in his official

10   capacity.

11         24.    Defendant Federal Railroad Administration ("FRA") is an agency within DOT

12   which Congress has charged with disbursing and overseeing the grant funds at issue in this case.

13         25.    Defendant Drew Feeley is the Acting Administrator of FRA and is responsible for

14   the actions and decisions challenged in this action.  Defendant Feeley is sued in his official

15   capacity.

16                                    **BACKGROUND**

17   **I.    CALIFORNIA'S HIGH-SPEED RAIL PROGRAM**

18         26.    Developing a high-speed rail system has been a long-term strategic goal of

19   California, supported by both Republican and Democratic Governors for more than three decades.

20         27.    In 1993, under Governor Pete Wilson, the California Intercity High Speed Rail

21   Commission was established to investigate the feasibility of high-speed rail in California, and

22   concluded that a high-speed rail system in California was technically, environmentally and

23   economically feasible.  Three years later, in 1996, the Legislature passed, and Governor Pete

24   Wilson signed into law, the High-Speed Rail Act, which established the Authority to continue the

25   Commission's work in planning and developing a high-speed rail system.  Cal. Pub. Util. Code

26   § 185000 et seq.

27         28.    In 2008, the Legislature passed, Governor Arnold Schwarzenegger signed, and the

28   voters approved Proposition 1A (titled "the Safe, Reliable High-Speed Passenger Train Bond Act

7

for the 21st Century"). Proposition 1A envisions a system of high-speed rail trains stretching from San Francisco through Los Angeles to Anaheim, and eventually extending to Sacramento and San Diego. Proposition 1A divides this system into two phases, the first of which connects San Francisco to Los Angeles and Anaheim on a route through the Central Valley. Proposition 1A also contemplates that the first phase will be built in corridors and smaller "usable segments." Cal. Sts. & High. Code §§ 2704.04(b)(2), 2704.08(a), (c)(1), (d).

29.    Proposition 1A authorized the issuance of $9.95 billion in general obligation bonds to initiate construction of the high-speed rail system. Cal. Sts. & High. Code § 2704.04(b).

30.    In 2014, the California Legislature provided the Authority with a continuing source of revenue for the high-speed rail system by allocating to the system 25 percent of the revenues from the State's auction of greenhouse gas emissions allowances ("cap-and-trade revenue"). Cal. Health & Safety Code § 39719.

31.    The high-speed rail system contemplated by these enactments is a critical element of the State's efforts to meet its growing transportation demand, and particularly the demand for an intercity transportation system. Interstate highways, commercial airports, and conventional passenger rail are operating at or near capacity. In many California regions, freeway and airport expansion is not viable because of land-use constraints. Even where freeway and airport expansion may be viable in other parts of the State, it would require enormous public investments that far exceed the cost of high-speed rail.

32.    California's high-speed rail system is also critical to the State's environmental and climate change goals. The train will be powered by electricity, in contrast to airplanes and most automobiles. The system will improve air quality by reducing vehicle miles traveled by automobiles and airplanes, reducing criteria pollutant emission from the transportation sector. As the California Legislature found, the high-speed rail system "will contribute significantly toward the goal of reducing emissions of greenhouse gas and other air pollutants" and provide "the foundation for a large-scale transformation of California's transportation infrastructure." 2014 Cal. Stat. ch. 36, p. 96 (S. Bill 862).

33.    California's high-speed rail system is also an essential strategy for efficient

1   transportation energy use.  Per passenger, a trip on the high-speed rail system will use one-third

2   the energy of a similar trip by air and one-fifth the energy of a trip by car.

3         34.    The economic benefits from high-speed rail construction are significant.  An

4   analysis prepared for the U.S. Treasury Department estimated net economic benefit from the

5   California high-speed rail project of between $130.3 and $260.6 billion.  Much of the initial

6   economic benefit will flow to California's historically disadvantaged Central Valley.  As of

7   March 31, 2025, high-speed rail project construction in the Central Valley has generated over

8   13.4 million hours of work for 11,489 workers, with an average of over 1,600 workers dispatched

9   daily to more than 35 active construction sites.  It will also make the Central Valley more

10  accessible to the State's major metropolitan areas, further stimulating the economy.

11        35.    The initial segment of the system originally was to run from north of Bakersfield

12  through Fresno to Madera.  As discussed further below, in 2021 the Authority extended the initial

13  segment to run from downtown Bakersfield at the south end to Merced at the north end,

14  connecting three major cities in the Central Valley.

15  **II.    STATUTORY SOURCES OF GRANT FUNDING**

16        36.    In February 2009, Congress enacted the American Recovery and Reinvestment

17  Act, Public Law 111-5 ("ARRA").  ARRA provided $8 billion for high-speed rail and intercity

18  passenger rail projects, but required that FRA obligate the funds no later than September 30,

19  2012, Pub. L. No 111-5, 123 Stat. at 208, and required that grant monies be expended by

20  September 30, 2017.

21        37.    In 2009, Congress passed the Consolidated Appropriations Act, 2010, Pub. Law

22  111-117, 123 Stat. 3057 ("2010 Appropriations Act"), which provided additional funding for the

23  development of segments or phases of intercity or high-speed rail corridors.

24        38.    In 2021, Congress enacted the Infrastructure Investment and Jobs Act ("IIJA"),

25  (Pub. L. No. 117-58, Nov. 15, 2020 ("IIJA"), funded by the March 15, 2022, Consolidated

26  Appropriations Act, 2022, Div. L Tit. I (Pub. L. No. 117-03 (Mar. 15, 2022) and the December

27  29, 2022, Consolidated Appropriations Act, 2023 (Pub. L. 117-328 (Dec. 29, 2022).  The IIJA

28  made $711.8 billion available for grants to tribes, States, localities and territories to support

transportation, clean energy, broadband and other infrastructure projects.  DOT received 74 percent of these funds.  Among other programs, the IIJA provided a source of funds for the Federal-State Partnership for Intercity Passenger Rail Grant Program.

**III.    THE AUTHORITY'S FEDERAL GRANTS**

39.    Since the inception of the high-speed rail program, the Authority has been awarded approximately $6.9 billion in FRA grants, and out of that amount FRA and the Authority have executed Cooperative Agreements totaling about $6.1 billion.  Each Cooperative Agreement calls for reimbursement of State monies spent according to each Cooperative Agreement's federal and grantee contribution formula.  Reimbursement requests must be approved by FRA.  Under the terms of the Cooperative Agreements, certain funds are allocated to specific tasks or projects over the course of the grant term.

40.    To date, FRA has approved and disbursed $2,570,900,000 under the Cooperative Agreements.  Almost all of this money was disbursed before 2018.  Since then, FRA has approved and disbursed only $26.6 million, mostly for the design of the Madera-to-Merced extension.

41.    California is responsible for all project costs in excess of the federal grant funds, including but not limited to the State's matching obligations under those grants.  To date, the State has provided nearly 77 percent of the funding for the project.  It has expended $11.8 billion to date, dwarfing the approximately $2.57 billion FRA has contributed, and the State has committed additional funds from cap-and-trade revenues of about $9.46 billion to the project.

**A.    The Grants at Issue in This Action**

**1.    The FY10 Cooperative Agreement**

42.    In 2010 and 2011, FRA awarded the Authority two grants under the 2010 Appropriations Act, totaling $928,620,000: an award of $715 million requiring a 30 percent State match, and an award of a little more than $213 million requiring a 20 percent match.

43.    Pursuant to these awards, on November 18, 2011, FRA and the Authority executed the FY10 Cooperative Agreement, Cooperative Agreement No. FR-HSR-0118-12.  The FY10 Cooperative Agreement was amended in June 2021, as a result of the settlement in *California v.*

10

1    *U.S. Department of Transportation*, Case No. 3:19-cv-2754-JD (N.D. Cal.), discussed below.  It

2    was amended again in November 2024.

3         44.    The FY10 Cooperative Agreement covers preliminary engineering and

4    environmental work in support of the entire 520-mile segment between San Francisco, Los

5    Angeles and Anaheim.  It provides construction funding for only an initial 119-mile portion of

6    infrastructure and track on the FCS in the Central Valley, spanning from North of Bakersfield to

7    Fresno.

8         45.    The end of performance and end of funding date for the FY10 Cooperative

9    Agreement is January 31, 2030.  No funds have been disbursed to date under the FY10

10   Cooperative Agreement, and no funds are currently owing to the Authority under the FY10

11   Cooperative Agreement.

12         **2.    The FSP Cooperative Agreement**

13         46.    In 2023, FRA awarded the Authority a grant totaling $3,073,600,000 under the

14   FRA Fiscal Year 2022 Federal-State Partnership for Intercity Passenger Rail Grant Program.

15   This grant was authorized under the IIJA.  The award called for phased funding, with initial

16   funding of $1,711,980,267, a second round of $680,809,867, and a third round of $680,809,866.

17         47.    On September 23, 2024, FRA and the Authority executed the FSP Cooperative

18   Agreement, Cooperative Agreement No. 69A36524521070FSPCA, obligating the first round of

19   funding of $1,711,980,267.  On November 11, 2024, FRA and the Authority executed

20   Amendment 1 to the FSP Cooperative Agreement, obligating the second round of funding of

21   $680,809,867.

22         48.    The end of performance and end of funding date for the FSP Cooperative

23   Agreement is July 31, 2034.  FRA has disbursed $1.4 million under the FSP Cooperative

24   Agreement, and FRA has approved $400,000 in state matching funds the Authority has expended

25   on this project.  No monies are currently owed to the Authority under the FSP Cooperative

26   Agreement.

27

28

11

IV.    **THE STATE AND FEDERAL GOVERNMENTS' COLLABORATIVE APPROACH (2008-2016)**

49.    Major infrastructure projects require the sustained cooperation of numerous agencies and entities.  For the high-speed rail program, this includes not just FRA, but also the Surface Transportation Board, the Environmental Protection Agency, the California State Transportation Agency, the California Public Utilities Commission, providers of commuter rail like Caltrain, the cities and counties through which the system will run, and BNSF and Union Pacific Railway (UPRR), which operate freight trains in California.

50.    Under earlier administrations, the Authority and FRA cooperated and collaborated effectively toward achieving their common goal of constructing the first true high-speed rail system (i.e., one operating at speeds up to 220 miles per hour) in the United States.

51.    Recognizing the need for flexibility, FRA grants explicitly permit amendments to deal with evolving circumstances.  In fact, the FY10 Cooperative Agreement has been amended five times, under two Presidential administrations.

52.    As an example, in 2012, after the filing of litigation challenging California's ability to use Proposition 1A bond proceeds on the Project, FRA and the Authority amended an earlier $2.5 billion Cooperative Agreement funded by ARRA (the "ARRA Cooperative Agreement") to allow a tapered match payment arrangement whereby federal funds would be used first until fully expended, after which the State would spend its funds until the federal expenditures are fully matched.

53.    In late 2013, while the same litigation was on appeal, FRA and the Authority further agreed to slow down project construction, pending the results of the appeal or access to alternative state matching funds.  And in 2014, with Proposition 1A bond proceeds still tied up in litigation, the California Legislature allocated to the Authority 25 percent of the State's cap-and-trade revenues so that the Authority would have another source of State funds available for matching the federal grant funds.

54.    The Authority officially broke ground and commenced construction on the project in the Central Valley in January 2015.

## V.    UNDER PRESIDENT TRUMP, FRA CEASES ALL COOPERATION AND COLLABORATION, ULTIMATELY LEADING TO LITIGATION (2018-2020)

55.    After President Trump first took office, things changed dramatically. Beginning in 2018, FRA effectively ceased cooperating on the ARRA Cooperative Agreement and the FY10 Cooperative Agreement, as well as on the critical environmental review process.  As a result, the Authority's efforts to obtain National Environmental Policy Act (NEPA) environmental clearances ground to a halt.

56.    By mid-February 2019, FRA had cancelled all previously scheduled meetings with the Authority, declined to attend any meetings scheduled by the Authority, and stopped responding to the Authority's communications.

57.    On February 13, 2019, one day after Governor Newsom announced that two-thirds of the California National Guard forces currently on the border would be redeployed to assist the California Department of Forestry and Fire Protection in preparing for fire season and to boost the National Guard's statewide Counterdrug Task Force, President Trump inaccurately tweeted that "California has been forced to cancel the massive bullet train project" and that "[t]hey owe the Federal Government three and a half billion dollars.  We want that money back now."

58.    That same day Governor Newsom stated that the high-speed rail project had not been "cancelled," and affirmed that California is "building high-speed rail, connecting the Central Valley and beyond."

59.    Five days later, on February 18, 2019, California led a coalition of 16 states in filing a lawsuit challenging President Trump's declaration of an emergency at the border and his announcement that he would use funds that had not been appropriated by Congress to construct portions of the border wall for which Congress had denied appropriations requests.

60.    The following morning, the President tweeted a response directly linking the border wall litigation to California's high-speed rail project: "As I predicted, 16 states, led mostly by Open Border Democrats and the Radical Left, have filed suit in, of course, the 9th Circuit! California, the state that has wasted billions of dollars on their out-of-control Fast Train, with no hope of completion, seems in charge!"

61.     One minute later, President Trump tweeted that "[t]he failed Fast Train project in California, where the cost overruns are becoming world record setting, is hundreds of times more expensive than the desperately needed Wall."

62.     Later that day, in a three-page letter, FRA notified the Authority of its intent to terminate the FY10 Cooperative Agreement effective March 5, 2019, and to deobligate the funds immediately after that.

63.     The Authority timely responded to FRA's notice of intent to terminate on March 4, 2019, rebutting in detail each and every asserted ground for termination.  Nevertheless, without any further process, on May 16, 2019, FRA sent a letter to the Authority announcing its final decision to terminate the FY10 Cooperative Agreement.  FRA did not make any of the efforts at conciliation or compliance required by its own procedures and policies, and its 25-page termination letter set out a raft of detailed allegations about the Authority's supposed non-compliance with the Cooperative Agreement that it had not included in its notice of intent to terminate or elsewhere, and that the Authority had no opportunity to rebut before FRA acted.

64.     On May 21, 2019, the Authority and the State filed suit seeking a declaration that the FY10 Cooperative Agreement termination decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, for a judgment setting aside the termination decision, and for an injunction preventing the federal government from re-obligating the grant funds to another grantee or otherwise transferring the funds.  *State of California et al. v. U.S. Department of Transportation et al*., Case No. 3:19-cv-02754-JD (N.D. Cal.) (hereafter, "*California v. DOT*").

65.     After Plaintiffs threatened to file an application for a temporary restraining order preventing re-obligation of the funds, Defendants stipulated that no portion of the grant funds would be re-obligated, transferred, or awarded to any other program or recipient except through a new Notice of Funding Opportunity and award issued in accordance with applicable rules and regulations and standard practices and procedures.  The practical result of the stipulation was that Plaintiffs would have sufficient time to seek a preliminary injunction if Defendants took steps to re-obligate the grant monies.  Defendants did not issue a new Notice of Funding Opportunity

14

during the pendency of the litigation.

66.     While the litigation was pending, the Authority's plans for building the initial segment in the Central Valley expanded.  Originally, it planned to construct (and the FY10 Cooperative Agreement contemplated) only the FCS.  The location, topography and length of that section made it suitable for the necessary testing of trains prior to the initiation of passenger service, but not suitable for revenue passenger services.

67.     After President Biden took office, in April 2021, the Authority adopted and submitted to the Legislature a business plan expanding the original segment in the Central Valley from 119 miles to 171 miles, extending from downtown Bakersfield though Fresno and Madera to Merced, and planning early passenger service on that expanded segment (the Early Operating Segment or EOS).  It determined this was the best way to get high-speed rail up and running as quickly as possible; the segment will tie together three of the largest cities in the Central Valley, three major universities, and three of California's fastest growing counties, and also will provide transit connectivity to the north (via the Altamont Corridor Express and Amtrak trains traveling to Sacramento and the Bay Area) and the south (with bus services from Bakersfield to Los Angeles).

68.     In June 2021, the parties settled the *California v. DOT* litigation.  Under the terms of the settlement, the FY10 Cooperative Agreement was amended, and the FY10 grant funds were re-obligated to the California high-speed rail project.

## VI.   THE AUTHORITY'S COMPLIANCE WITH THE COOPERATIVE AGREEMENTS AND SUBSTANTIAL PROGRESS ON THE PROJECT

69.     Construction across the 119 miles in the Central Valley is well-advanced.  As of February 2019, the Authority had completed four major structures: one viaduct, one bridge and two overhead crossings.  Since then, the Authority has completed construction of 51 additional major structures:  five viaducts, two bridges and 44 overhead crossings or underpasses.  Each of these completed structures was a significant project.  The San Joaquin River viaduct is 4,741 feet long, 43 feet wide and 210 feet tall at its highest point.  Construction is underway on 29 major structures, with only 8 major structures not yet under construction.  The Hanford Viaduct in Kings County, scheduled for completion in December, is over a mile long and is comprised of

286 columns and 978 pre-cast concrete girders.  In addition to all of these major structures, the Authority has constructed hundreds of irrigation crossings and wildlife crossings.

70.     The Authority has completed 70 miles of guideway for the laying of track, with an additional 27 miles under construction.  And the Authority is in the process of constructing a railhead, or depot, for delivery of track to the project, due for completion this year.

71.     The Authority has had to engage in extensive utility relocation work (moving electric, gas, telecommunications, water, sewer and irrigation), which has required the cooperation of dozens of utility owners within the 119 miles under construction.  Some of these relocations are very complicated, requiring construction of new facilities.  Moreover, because utilities must maintain services to their customers, the work often must be scheduled months in advance, or during specific windows of time.  Some relocations require the cooperation of multiple utilities.  Despite these difficulties, the Authority has relocated 1,572 of 1,826 utilities to date that are necessary to construct the initial 119-mile FCS, and an additional 102 utility relocations are underway.

72.     In addition to this extensive construction, the Authority has also accomplished much of the planning, design, legal and environmental work required by the project.  Notably, the Authority has completed all programmatic and project-level environmental reviews under both NEPA and the California Environmental Quality Act for the entire alignment from downtown San Francisco to downtown Los Angeles.  It has also reached agreements with cities on station design and other issues, as well as agreements with BNSF and Union Pacific, which have freight rail lines that are impacted by the high-speed rail system.  Ninety-nine percent of the parcels needed for the FCS have been acquired; this time-consuming process of land acquisition required the Authority to reach agreements with property owners for 1,567 parcels and to bring lawsuits to acquire 781 more.  Design of the Merced extension is also well-advanced.

73.     The Authority's work has not been confined to the EOS.  Four hundred and sixty three of the 494 miles of the San Francisco to Los Angeles/Anaheim system are environmentally cleared and construction ready.  Among other things, the Authority provided $714 million to fund the successful California Electrification Project between San Francisco and San Jose, which will

1   become part of the blended high-speed rail system, in which high-speed trains will share track

2   and infrastructure with Caltrain commuter trains. Salesforce Transit Center—the multimodal hub

3   that will serve as the Authority's Northern California terminal station—began operations in

4   downtown San Francisco in 2018.

5         74.    In South Los Angeles County, monies from the State high-speed rail bond funds

6   contributed to the $137.2 million cost of building a vehicle overpass at the intersection of

7   Rosecrans and Marquardt Avenues in Santa Fe Springs, crossing over BNSF's freight tracks and

8   future high-speed rail tracks, which has replaced an at-grade crossing rated by the California

9   Public Utilities Commission as the most hazardous rail crossing in the State.

10        75.    FRA has closely monitored the Authority's performance under the Cooperative

11  Agreements. Among other things, the Authority has provided regular reports and updates

12  allowing FRA to verify that the Authority is in compliance with a variety of grant requirements.[2]

13  The Authority and FRA meet monthly (at the staff level) and quarterly (at the executive level) to

14  discuss the project. In addition, FRA conducts Site Monitoring Reviews designed to provide the

15  Authority and FRA an opportunity to review issues that have arisen over the previous year and

16  address any ongoing or anticipated needs and concerns.

17        76.    When a Site Monitoring Review discloses a need for corrective action for a

18  project, FRA issues a "Significant Finding" in its Site Monitoring Review Report demanding

19  corrective action. In the entire history of the project, FRA has only once issued a finding

20  demanding corrective action. This was more than a decade ago, in 2014, in connection with the

21  ARRA Cooperative Agreement, and the Authority promptly implemented a corrective action plan

22  that resolved the matter. Indeed, the "Significant Findings" section of the most recent Monitoring

23  Report, issued on October 21, 2024, states: "FRA did not identify any fraud, waste, abuse or other

24  significant findings that would impact project compliance or compliance with the terms and

---

25      [2] Pursuant to the Cooperative Agreements, the Authority provides FRA with regular reports about every aspect of the Project, including but not limited to: quarterly contingency

26  management plans, financial reports, project progress reports, funding contribution plans, quarterly budget updates, quarterly progress reports, quarterly right-of-way acquisition reports,

27  and quarterly summary schedule updates. Semi-annually, the Authority submits a detailed Base-Line Construction Schedule. And annually the Authority provides a Work Plan, and a Central

28  Valley Project Financial Plan.

1    conditions of the cooperative agreements."

2         77.    In addition, the Authority performs periodic risk assessment analyses, including

3    but not limited to risks associated with funding uncertainty and schedule monitoring and

4    management.  These analyses are prepared by Authority personnel with training, expertise and

5    experience in assessing risk associated with projects like this one.  These risk assessments use a

6    model prescribed by FRA and available on FRA's website.  *See*

7    https://www.transit.dot.gov/regulations-and-guidance/risk-and-contingency-review-op4.  The risk

8    analyses set forth the modeling, assumptions and exceptions used in the analyses, so that a

9    reviewer can appropriately evaluate the assessment.  FRA periodically reviews the Authority's

10    risk assessment analyses, selecting specific aspects of the project for that review.  In 2023, FRA

11    conducted such a review, including meetings with the Authority.  That review identified no

12    significant concerns.[3]  Among its observations, FRA indicated that the Authority has "a robust

13    process and tracking system for design risk" and that the Authority "has a thorough risk

14    register."[4]

15         78.    FRA has also demonstrated its satisfaction with the Authority's progress on the

16    high-speed rail system and its performance under the Cooperative Agreements through its

17    conduct, including awarding additional grants to the Authority and entering into new Cooperative

18    Agreements.  Here are a few examples:

19        a.    On January 4, 2024, FRA and the Authority executed a Cooperative Agreement in the

20           amount of $25 million from the Rebuilding America Infrastructure with Sustainability

21           and Equity (RAISE) program to fund the design of the Madera-to-Merced extension of

22           the EOS (the "Merced Extension Cooperative Agreement").  The Authority has agreed

23           to provide matching funds of $16 million for this project.  The end of performance and

24           end of funding date for the Merced Cooperative Agreement is March 31, 2026.  FRA

25           has disbursed $24.4 million under the Merced Cooperative Agreement, and FRA has

26           approved $15.6 million in state matching funds the Authority has expended.

27

28        [3] *See* FRA Risk Review California High-Speed Rail Project, July 31, 2023.
    [4] *See* FRA Risk Review California High-Speed Rail Project, July 31, 2023.

b. On September 12, 2024, FRA and the Authority executed a Cooperative Agreement in the amount of approximately $202 million from the 2022 Consolidated Rail Infrastructure and Safety Improvements (2022 CRISI) program (the "Shafter Grant Cooperative Agreement") to complete design, purchase right-of-way, and construct six grade separations in Shafter for both the existing BNSF freight-train track and for future high-speed rail alignment at Poplar Avenue, Fresno Avenue, Shafter Avenue, Central Avenue, Lerdo Highway and Riverside Street.  Grade separations dramatically improve safety for cars, bicycles, pedestrians and wildlife by using underpasses or overpasses instead of at-grade crossings. The Authority has agreed to provide matching state funds of $89,873,197 for the project.  The end of performance and end of funding date for the Shafter Cooperative Agreement is March 31, 2031.  FRA has disbursed $100,000 under the Shafter Cooperative Agreement.

c. On September 18, 2024, FRA and the Authority executed a Cooperative Agreement in the amount of $20 million for the Historic Depot Renovation and Plaza Activation Project (the "Fresno Cooperative Agreement").  The project will restore a nationally registered historic passenger rail depot building for the Fresno high-speed rail station and create a neighboring park and plaza.  The Authority agreed to provide $13.2 million in State matching funds for the project.  The end of performance and end of funding date for the Fresno Cooperative Agreement is July 31, 2028. All federal funds have been disbursed under the Fresno Cooperative Agreement and FRA has approved all $13.2 million of the Authority's matching obligation.

d. In January 2025, FRA awarded the Authority a grant of $89,650,000 to construct an overcrossing at Le Grand Road in the Madera-to-Merced extension (the "Le Grand Overcrossing Grant").  As of July 2025, FRA and the Authority were in the process of finalizing the terms of the cooperative agreement for this project.

79.     In addition, in 2023 the Authority was selected for the Corridor Identification and Development Program.  The program is phased, with an initial grant of $500,000.  Projects selected for the program became entitled to funding under FRA's financial assistance program

and receive priority for grants under the Federal-State Partnership for Intercity Passenger Rail

Grant Program.  Considerations for selection to the program included the following criteria,

among several other things:

    a.   projected ridership, revenues, capital investment, and operating funding requirements;

    b.   anticipated positive economic and employment impacts, including development in the areas near passenger stations, historic districts, or other opportunity zones;

    c.   committed or anticipated State, regional transportation authority, or other non-Federal funding for operating and capital costs; and

    d.   whether the corridor connects at least two of the 100 most populated metropolitan areas.[5]  49 U.S.C. § 25101(c),

80.    Each of these grants was issued long after the Authority decided to focus on implementing revenue-generating high-speed rail service on the EOS in the Central Valley, and FRA was well aware that construction of the north and south ends of the Los Angeles-to-San Francisco high-speed rail corridor would be deferred until additional funding was available.

## VII.  THE CHALLENGES INHERENT IN LARGE INFRASTRUCTURE PROJECTS

81.    The U.S. government's financial investment in high-speed rail has been exceedingly small in relation to other modes of transportation.  Between 1949 and 2017, the U.S. government invested $10 billion in high-speed rail.  During that same period, it invested over $2 trillion in highways and $777 billion in aviation.  By contrast, China opened up its first high-speed rail line in 2008.  It has invested over $1.4 trillion to build its high-speed rail network, spanning nearly 28,000 miles.

82.    Major infrastructure projects face challenges at every stage—from planning, funding, environmental review, coordination with municipalities, and acquisition of private property, to the physical challenges of construction—that cannot be fully predicted or addressed until they occur.

83.    For example, in 1972, the Bay Area Rapid Transit System (BART) opened its

---

[5] The Fresno and Bakersfield metropolitan areas are among the 100 most populous metropolitan areas in the United States.

initial 28 miles of rail for service (in the East Bay, not yet extending into San Francisco) after 15 years of planning, eight years of construction and more than $1.6 billion spent ($12.7 billion in 2025 dollars). Today, the network has more than 131 miles of track and 50 stations across the Bay Area.

84.    Plans for the East Side Access project in New York City were proposed in 1963 and then revived in the late 1990s. That project received federal funding in 2006. The project, which extended the Long Island Railroad just two miles, was originally scheduled to open in 2009, but was delayed by more than a decade, finally opening for service in 2023. The final cost of $11.6 billion was substantially higher than the original estimated cost of $3.5 billion, even excluding billions of dollars in support projects not yet completed.

85.    New York's Second Avenue subway line was originally proposed in 1920. In 1942 and 1955, elevated lines were demolished to accommodate it. Construction finally started in 1972, but was halted for lack of funds in 1975. The project was revived in 2007 and construction began on Phase 1 of four planned phases. That first phase, which included only three stations and 1.8 miles of tunnel, took ten years to complete and cost $4.6 billion. New York is planning a second phase of just over one mile, which is anticipated to cost least $6 billion and is not yet under construction.

86.    London's Crossrail project added new stations and 118 kilometers (73 miles) of tunnel and additional stations to the London Underground. Construction began in 2009, and the line ultimately opened in 2022 at a cost of £18.8 billion, or approximately $24.3 billion at today's exchange rate.

87.    The Loma Prieta Earthquake in 1989 weakened the eastern span of the Bay Bridge between San Francisco and Oakland. Original plans to repair the span were changed to a plan to replace the structure. A bid for $1.43 billion for the construction was accepted on March 2006. The 2.2-mile span was finally completed in 2013—24 years later—at a total cost of about $6.5 billion.[6]

---

[6] https://mtc.ca.gov/news/san-francisco-oakland-bay-bridge-self-anchored-suspension-sas-span-contract-awarded

88.     President Trump's border wall with Mexico is yet another example of how final costs and timelines for large infrastructure projects often far exceed original estimates.  President Trump initially stated that the wall along the border between the United States and Mexico would cost $12 billion, and that it would be paid for by Mexico.  Within months, the estimated cost had increased to $21.6 billion.[7]  To expedite construction of the border wall, federal agencies used "their statutory authorities to waive or disregard laws that they otherwise would have been required to comply with when undertaking such construction projects," including the National Historic Preservation Act of 1966, NEPA, and other cultural and natural resource-related laws.[8][9] Still, progress has been slow.  From January 2017 through January 2021, the federal government built only 458 miles of the pledged 1,000 mile border wall at a cost of approximately $10.6 billion (none of it paid for by Mexico).[10]  Only about 69 miles of that stretch were for completed wall systems.[11]  And only about 87 miles consisted of new construction; the bulk of it replaced existing border structures erected under the administrations of George W. Bush and Barack Obama.[12]  In addition, only about 16 miles of new construction was on private property, meaning that most of the construction did not require the time and expense of acquiring right-of-way.[13]  By January 2020, the anticipated cost had increased to $20 million per mile, making it the most expensive border wall in the world.[14]  In 2025, Congress appropriated an additional $46.5 billion

---

[7] https://www.reuters.com/article/world/exclusive-trump-border-wonlyall-to-cost-216-billion-take-35-years-to-build-idUSKBN15O2ZY/

[8] *See* GAO-23-105443 at 2.

[9] Negative impacts from the project included irreparable damage to historic sites and sites sacred to Tribes; disruption of natural water flows, exacerbating flooding risk; and damage to wildlife habitat.  *See* GAO-23-105443 at 22-25.

[10] GAO Report GAO-23-105443 to Committee on Natural Resources, House of Representatives, *Southwest Border Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction* (Sept. 2023) (hereafter, "GAO-23-105443"); GAO Report GAO-21-372 to Congressional Requesters, *Southwest Board Schedule Considerations Drove Army Corps of Engineers' Approaches to Awarding Construction Contracts Through 2020* (hereafter, "GAO-21-372") 14.  $4.3 billion was awarded in non-competitive contracts.  *Id.* (Highlights).

[11] GAO-21-372 at 33-34.

[12] *See* GAO-23-105443; John Burnett, NPR, *$11 Billion and Counting: Trump's Border Wall Would Be the World's Most Costly* (Jan. 19. 2020).  650 miles of border structures were erected during the Bush and Obama administrations.

[13] *See* GAO-23-105443 at 17 & n.42, 60.

[14] *See $11 Billion and Counting.*  In contrast, the border structures built during President George W. Bush's administration cost about $3.9 million per mile. Israel's wall on the West

(continued…)

to complete the border wall.  Assuming no further cost increases, the total cost to complete the wall will be roughly $57.5 billion, a nearly five-fold increase since its announcement in 2016.

## VIII. FRA'S COMPLIANCE REVIEW AND THE GRANT TERMINATIONS

89.     On February 4, 2025, shortly after President Trump began his second term, he issued a statement indicating that he intended to start an investigation of the California high-speed rail project.   The President wrongly asserted that the project was "hundreds of billions of dollars over budget,"[15] and that it would be cheaper to take passengers between San Francisco and Los Angeles by limousine.

90.     On February 20, 2025, Secretary Duffy announced he was going to direct FRA to initiate a compliance review of funding to the Authority.  "And we're going to look at whether California High-Speed Rail has actually complied with the agreements they've signed [and whether] they [are] spending it per the agreements that they made with the federal government." He suggested that the project was riddled by fraud, waste or abuse, positing: "Who got rich? What consultants? What politicians? What politicians' husbands got rich off this money?"  The same day, the Chief Counsel for FRA advised the Authority by letter that FRA intended to initiate a compliance review of the Authority's federal grants, including the FY10 Cooperative Agreement and the FSP Cooperative Agreement—despite the fact that FRA had just completed a monitoring review of the project in October 2024, just four months earlier, which concluded that "FRA did not identify any fraud, waste, abuse or other significant findings that would impact project compliance or compliance with the terms and conditions of the cooperative agreements."

91.     To date no monies have been disbursed under the FY10 Cooperative Agreement and only about $1.4 million has been distributed under the FSP Cooperative Agreement—which disbursement was approved by FRA.  That did not stop Secretary Duffy from announcing on April 29, 2025, "We are also investigating how California spent roughly $4 billion from Biden,

Bank—the second most expensive border wall in the world—cost $1 million to $5 million per mile.
[15] President Trump's statement that the project is "hundreds of billions of dollars over budget" exemplifies how untethered from the facts the administration's efforts to stop California's high-speed rail project has been.  The total cost of the project to date is about $14.37 billion.  And approximately 77% of that has been funded by the State.

1  only to get no results."

2  92.   At the same time that the President and Secretary Duffy were disparaging

3  California's high-speed rail project, Secretary Duffy was extolling the Brightline West Las Vegas

4  to Victor Valley Project ("Brightline West"), a complementary high-speed rail project planned to

5  run from Las Vegas to the outskirts of the Los Angeles metropolitan area.  Like all large

6  infrastructure projects, Brightline has had its challenges.  Brightline West is a private project,

7  which Secretary Duffy has inaccurately praised as being "on time and on budget."  The Brightline

8  project dates back to 2005, when it was branded the DesertXPress High-Speed Passenger Train

9  Project.  In 2012 it was rebranded XPress West, and then again rebranded as Brightline West Las

10  Vegas to Victor Valley Project in 2022.  In September 2024, Brightline West received a $3 billion

11  federal grant under the Federal-State Partnership for Intercity Passenger Rail Grant Program.  As

12  planned, Brightline West will run for virtually all of its 218 miles on the existing, relatively flat,

13  Interstate 15 right of way—meaning that, unlike California high-speed rail, it has no need to

14  acquire large swaths of private property, build overpasses and undercrossings, or find the

15  financing for costly tunneling.  Despite these logistical advantages, Brightline West did not break

16  ground until 2024, and actual construction on the project has not begun.  Earlier this year,

17  Brightline West announced that it does not expect to be open for service in time for the 2028

18  Olympics, as previously planned.

19  93.   Secretary Duffy has also incorrectly described Brightline West as "going from LA

20  to Las Vegas."  In fact, Brightline West will not extend into the City of Los Angeles itself.  It is

21  currently planned to run from Las Vegas to Rancho Cucamonga, about 40 miles east of Los

22  Angeles.  A MetroLink commuter rail line from Rancho Cucamonga to L.A. Union Station runs

23  hourly and takes 1 hour and 20 minutes.

24  94.   The compliance review ordered by Secretary Duffy began with a February 27,

25  2025, letter from FRA's chief counsel requesting vast amounts of information and thousands of

26  documents touching on virtually every aspect of California's high-speed rail project. FRA gave

27  the Authority only 30 days to provide those materials.  Then, after receiving the Authority's

28  initial response, FRA requested more. The Authority nevertheless worked diligently and quickly,

1    providing all the requested information on time.  The Authority completed its production of

2    documents, totaling some 80,000 pages, on May 2, 2025.

3        95.    Also on May 2, Ian Choudri, the Authority's Chief Executive Officer, wrote to

4    Drew Feely, Acting Administrator for FRA, requesting a meeting to discuss any questions or

5    concerns FRA may have, and stating that the Authority "would be prepared to address those

6    concerns forthrightly."

7        96.    But of course, as demonstrated by the President's and the Secretary's prior

8    statements, the Administration had already decided to terminate the Cooperative Agreements,

9    regardless of the results of the compliance review.  On May 6, before FRA had completed its

10   review, President Trump launched into an Oval Office diatribe about the high-speed rail project,

11   announcing that he had already told Secretary Duffy that "we're not going to pay for" the project.

12       97.    On June 4, 2025, FRA sent the Authority a Notice of Proposed Determination

13   stating its intent to terminate the FY10 Cooperative Agreement and the FSP Cooperative

14   Agreement—representing more than $4 billion in total funding—and attaching a Compliance

15   Review Report dated June 2025.  (Exhibit A.)  FRA asserted two bases for terminating the grants:

16   First, FRA asserted that the Authority would be unable to complete the EOS within the budget

17   and schedule set forth in the FSP Cooperative Agreement. In other words, FRA concluded that

18   the Authority will be unable to begin fare-paying passenger service on the EOS by December 31,

19   2033.  Second, FRA claimed that the Authority has no credible plan to address an approximately

20   $7 billion funding gap to complete the EOS.  The Notice also mentioned that the Authority

21   "cannot support representations it made when applying for Federal funds under the Cooperative

22   Agreement," but without specifying any particular representations or when they were made.  It

23   also vaguely alluded to "mismanagement of [the Authority's] commitment to deliver high-speed

24   rail service," without noting that termination of a Cooperative Agreement on grounds of

25   persistent non-compliance requires a specific notice and opportunity to cure procedure.

26       98.    In support of its proposed decision, FRA purported to rely on its Compliance

27   Review Report.  The Compliance Review Report was provided to the Authority for the first time

28   when the Notice of Proposed Determination was issued.  Contrary to past practice, the final

25

Compliance Review Report was not preceded by a meeting with the Authority to discuss the proposed findings. Such a meeting would have at least given the Authority an opportunity to provide input and offer corrections.

99.     Importantly, the Compliance Review Report disclosed no wrongdoing in connection with the project, despite Secretary Duffy's prior statements about waste, fraud and abuse. FRA simply concluded that the Authority "is not likely to achieve its commitment to deliver the EOS by 2033," and that the Authority "has no credible plan" for bridging an estimated $7 billion funding shortfall "beyond seeking additional federal funds."[16]

100.     FRA did not explain why it reached a different conclusion than it had just months before, in its October 21, 2024 Monitoring Report. In that report, FRA concluded that "FRA did not identify any fraud, waste, abuse or other *significant findings that would impact project compliance or compliance with the terms and conditions of the cooperative agreements*." (Emphasis added.)

101.     The Compliance Review Report attached a Schedule and Cost Risk Analysis ("FRA Risk Analysis.") The document was ostensibly prepared to bolster FRA's termination decision. The Authority was not informed that FRA intended to prepare a risk analysis, and therefore had no opportunity to provide input into the process. The FRA Risk Analysis is not a complete, credible or reliable risk analysis for the following reasons:

   a.   FRA apparently did not use documents and information prepared in the ordinary course of the Project, including risk assessment analyses prepared by the Authority's experienced risk management team. Indeed, the document was prepared without advising the Authority or giving the Authority the opportunity to provide any consultation or input.

   b.   The FRA Risk Analysis is incomplete because it did not utilize comprehensive and up-to-date information, even though that information was available to FRA. A key element of any competent risk assessment is a risk register—a complete list of the various risks that may hinder the completion of project goals at any given time. The

---

[16] Compliance Review Report at 1-2.

Authority provided FRA with a complete risk register, excluding commercially sensitive and confidential business information that the Authority offered to allow FRA to review in person, as is the parties' customary practice. FRA declined to review the register in person, even though FRA was on site at the Authority's offices for the parties' Quarterly Meeting on May 5, 2025.

c. The FRA Risk Analysis omits information critical to any risk assessment, including a complete risk register, an adequate description of the model used, and the underlying assumptions and exceptions of FRA's model. It fails even to disclose the persons who prepared it, much less their qualifications. Such information is needed to allow the Authority—or any independent reviewer—to adequately evaluate and respond to the alleged outcomes.

102. The Authority has a highly qualified risk-management team. The Authority provides the background, education, and experience of its risk professionals when updating FRA on risk assessments. The Authority is transparent about its risk-analysis methodology and shares information onsite with FRA. Its risk analysis process has historically been a collaborative process. As recently as 2023, FRA conducted a review of the Authority's risk analysis process consisting of document reviews and meetings, and FRA's report found the Authority's risk-analysis process to be "robust" and thorough.

103. In contrast, the FRA Risk Analysis was not the product of collaboration. It contains no indication of who conducted the risk review or their qualifications. Nor did FRA explain why the Authority's risk assessment analysis, which FRA reviewed just two years ago, was suddenly inadequate.

104. The Notice of Proposed Determination gave the Authority seven days, pursuant to Article 9.3(b) of the FSP Cooperative Agreement, to respond by either disputing that the Authority was in default or proposing corrective action to cure the alleged default. *See* Exhibit A at 5. In the event the Authority disputed default, the Notice of Proposed Determination stated that the Authority could provide documentation supporting its compliance within 30 days. Although the FSP allows the parties to extend the period for providing supporting documentation by an

1    additional 15 days, FRA denied the Authority's request for this modest 15-day extension.

2         105.    The Authority timely responded to the Notice of Proposed Determination,

3    disputing that it was in default under the Cooperative Agreements, by letter dated June 11, 2025.

4    Exhibit B.

5         106.    On June 18, well before the Authority's 30-day deadline to provide additional

6    detail and supporting documentation lapsed, President Trump criticized the project again, stating

7    that "we're not going to fund that anymore, it's out of control." The President also wrongly

8    asserted that the project is "one hundred times over budget" and claimed (again incorrectly) that

9    "they've spent, what is it, thirty or forty times more than they were supposed to spend."

10        107.    On July 7, 2025, the Authority timely provided additional detail and supporting

11   documentation in support of its dispute.  Exhibit C.

12        108.    In these submissions, the Authority responded point-by-point to the findings made

13   in the FRA Compliance Review Report and demonstrated, *inter alia*, that it remains on schedule

14   to timely commence revenue service on the EOS.  The deadline for commencing revenue service

15   on the EOS is December 2033, *more than eight years from now*.  The Authority's project

16   schedule shows it meeting that commitment.  FRA's assumption to the contrary rests on nothing

17   more than speculation that the Authority will be unable to resolve issues commonly encountered

18   in large projects, such as resolving third-party disputes and project change order requests, and the

19   fact that the Authority delayed finalizing its acquisition of train cars—called "rolling stock" or

20   "trainsets"—to reassess their technical specifications.  Although identified as an interim

21   milestone, rolling-stock acquisition is not an event of default or persistent noncompliance under

22   the Cooperative Agreements, and thus not a proper basis for termination.  The trainset

23   procurement milestone also is not a target that impacts final project completion.  Trainset testing

24   is several years away under the schedule, such that acquiring trainsets under the interim milestone

25   would mean only that the trainsets will sit idle before testing, so the delay in procurement does

26   not materially impact the overall project schedule.

27        109.    The Authority also demonstrated that FRA's assertions about a $7 billion funding

28   gap ignore both the project's history and concrete evidence to the contrary.  Absent future grants

1  to the Authority, the federal government's investment in the project is fixed.  Any shortfall in

2  project expenses will come from other sources.  Throughout the project, the State has covered

3  funding gaps, initially through a $9 billion bond act, and later through providing the project with

4  cap-and-trade revenue, which has provided $7.7 billion in funding to the project to date, with a

5  further $5.75 billion committed to the project.  The State has repeatedly demonstrated its financial

6  commitment to the project.

7        110.    The Authority also has a concrete plan, set out in the Governor's May 2025

8  Budget Revision and supported by leaders in the Legislature, to end any uncertainty associated

9  with the current cap-and-trade funding by providing a stable, continuing funding level of

10  $1 billion per year and extending the cap-and-trade program from 2030 to 2045.  The stability

11  that plan will afford is also expected to attract private investment. The Authority explained in its

12  July 7 submission that it has issued a Request for Expressions of Interest to private sector

13  investors.

14        111.    Moreover, the existence of this funding gap is not a new development.  Among

15  other things, it was clearly disclosed in the Authority's FSP grant application, which FRA

16  approved, notwithstanding the funding gap.  And in January 2025, the Authority's Office of

17  Inspector General noted that the Legislative Analyst Office had concluded that, given existing

18  uncertainties, including the uncertainty of further federal grants, "the Legislature will likely need

19  to identify billions in additional project funding within the next few years to help complete the

20  [EOS] segment."

21        112.    In short, FRA's asserted grounds for terminating the Cooperative Agreements

22  were baseless and pretextual.

23        113.    Indeed, just hours after the Authority submitted the July 7 supplemental

24  response— before FRA could have meaningfully reviewed it—President Trump and Secretary

25  Duffy made clear that termination was a foregone conclusion.  On July 8, Secretary Duffy

26  indicated that FRA would terminate the agreements within about five days, stating, "The

27  boondoggle will end up costing $120 billion and will never connect L.A. to San Francisco."  At

28  the same time, President Trump claimed that "not one track has been laid. $15 billion, and we're

1    16 years into the project. Not one track." The President's assertion ignored the fact that failure to

2    lay track is not one of FRA's asserted grounds for termination. Moreover, track laying is one of

3    the *final* steps of the construction process and can commence only after planning, land

4    acquisition, environmental clearances, construction of supporting structures (e.g., bridges,

5    viaducts, and overpasses) and construction of guideway. The Cooperative Agreements do not

6    require tracklaying to be completed until December 31, 2029 (in the case of the first 119 miles of

7    the section) and June 30, 2032 (in the case of the remaining 52 miles).

8           114.   On July 16, 2025, FRA notified the Authority that it was terminating the

9    Cooperative Agreements effective that day. It asserted that the decision was based on its

10   conclusion that the Authority "will not be able to deliver operation of a Merced-to-Bakersfield by

11   the end of 2033." *See* Exhibit D at 1. It stated that "the mere promise of delivering the EOS

12   *someday* and at *some cost* was not the bargain struck." *Id*. at 12 (emphasis in original). But the

13   Authority has never indicated that it plans to deliver the EOS *someday*. It remains committed to

14   delivering the EOS by the end of 2033, as required under the FSP Cooperative Agreement, and it

15   is on schedule to do so. FRA's speculation that "on average, CHSRA is expected to miss the

16   required EOS start date," *id*. at 2, a date more than eight years away, based an opaque and

17   unreliable "risk analysis," is arbitrary and capricious and blatantly insufficient to justify

18   termination of the Cooperative Agreements, one of which was executed just ten months ago. In

19   short, FRA's actions now—just like its actions six years ago—are entirely unjustified by the facts

20   on the ground. They reflect prejudging the outcome prior to (and regardless of) consideration of

21   the record. And they are a product of President Trump's extreme antipathy toward California.

22   Indeed, the same hour that FRA informed the Authority of its final termination decision, the

23   President posted on Truth Social that "[t]hanks to Transportation Secretary Sean Duffy, not a

24   SINGLE penny in Federal Dollars will go towards this Newscum SCAM ever again."

25   **IX.   FRA'S DEPARTURE FROM ORDINARY AGENCY PRACTICE**

26          115.   FRA's final decision to abruptly terminate the Cooperative Agreements, rather

27   than work with the Authority and impose graduated sanctions, if appropriate, was a sharp

28   departure from ordinary agency practice over many years.

116.    At the time the FY10 Cooperative Agreement was executed, DOT regulations provided that the remedies imposed for non-compliance with a grant or cooperative agreement should be "appropriate in the circumstances" and range from "[t]emporarily withholding cash payments pending correction of the deficiency" to more serious measures such as disallowing the use of funds and matching credit for "all or part of the cost of the activity not in compliance," "wholly or partly suspend[ing] the current award" or "withholding future awards." 49 C.F.R. § 18.43(a)(1)-(5).

117.    DOT's Financial Assistance Guidance Manual, issued March 2009, similarly provided that '[e]nforcement measures should match the seriousness of the problem" and that the agency official "should apply sound judgment in determining what enforcement measures are appropriate for a situation," and suggested escalating sanctions to secure compliance rather than termination.

118.    Effective December 26, 2014, the federal government adopted uniform remedies for DOT and other agencies that administer federal grants. 2 C.F.R. § 1.105(c). Under these regulations, when a grantee fails to comply with the terms and conditions of an award, the awarding agency "may implement specific conditions," 2 C.F.R. § 200.339, such as "[r]equiring additional project monitoring," requiring the recipient obtain technical or management assistance, and "[e]stablishing additional prior approvals," 2 C.F.R. § 200.208(c). If the agency subsequently "determines that noncompliance cannot be remedied by imposing specific conditions," the agency may then take additional corrective actions, including, among other things, suspending or terminating the award "in part or in its entirety." 2 C.F.R. § 200.339(c).

119.    In 2016, DOT published a Financial Assistance Manual, applicable to FRA, which states that, after identifying a material violation of a grant or cooperative agreement and attempting resolution, DOT should work with "Senior Management" and specified others within the agency "to determine the appropriate course of action." The Manual further states that if preliminary measures fail to bring a recipient into compliance, the recipient generally will not be terminated immediately; instead, it will be suspended and given an opportunity to take appropriate corrective action. According to that Manual, "[i]f the deficiencies are not corrected

31

1   during the suspension period, or when the deficiencies are so egregious that an end to the grant is

2   the only appropriate option, the [agency] should determine whether to proceed with termination."

3          120.    In 2019, DOT published a Guide to Financial Assistance, effective January 1,

4   2020.  It describes remedies when an agency determines that a grant recipient is not complying

5   with the terms and conditions of a grant.  "In the event that recipients do not comply with Federal

6   award requirements," it provides, "the [Operating Administration/Office of the Secretary] may

7   consider the use of a remedial action(s) to protect the integrity of Federal funds.  A remedial

8   action should be used only after other actions to improve a recipient's compliance or performance

9   have not been successful, or the OA/OST determines that other actions are unlikely to improve

10  compliance or performance."

11         121.    DOT practice, consistent with the DOT Manual and Guide and its regulations, is to

12  address grant compliance issues with escalating sanctions.  That process starts with providing

13  assistance, and if such assistance does not resolve the problem, notifying the grant recipient of a

14  need for corrective action.  Only if these measures are not successful, and the grantee fails to take

15  corrective action, is the harsher remedy of grant *suspension* considered.  The draconian measure

16  of grant *termination* is appropriate only in the most egregious circumstances.

17         122.    None of these required steps happened here.  Neither the notice of proposed

18  determination nor the final termination letter explains why FRA decided to depart from ordinary

19  agency practice in terminating the FY10 Cooperative Agreement and the FSP Cooperative

20  Agreement without imposing lesser sanctions first.  Nor do they explain why the FRA is

21  terminating the grants now, (1) without waiting to see what action the California Legislature will

22  take with respect to the proposed extension of the cap-and-trade program to 2045 and the $1

23  billion in stable, annual funding for the program, and (2) more than eight years prior to the

24  deadline for completion of the EOS, during which time other Federal and State funding could

25  become available even if the current cap-and-trade program is not changed by the California State

26  Legislature this summer.

27

28

**CLAIM FOR RELIEF**

**Administrative Procedure Act**

123.    Plaintiff incorporates the allegations of the preceding paragraphs by reference.

124.    The Administrative Procedure Act (APA), 5 U.S.C. § 706, authorizes this Court to set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  FRA's decision to terminate the FY10 and FSP Cooperative Agreements constitutes final agency action under the APA.

125.    FRA's decision to terminate the Cooperative Agreements and de-obligate the funds awarded under the Cooperative Agreements is contrary to its policies, procedures, and regulations, as well as its ordinary practices, which require that FRA first work with a grantee to address any non-compliance, and if that fails, proceed to issue a demand for corrective action, before it considers suspension—much less termination—of a Cooperative Agreement.  FRA failed to follow that course here.  Moreover, FRA's termination letter failed to provide any explanation for departing from its policies and ordinary practices.

126.    Defendants' rationale for terminating the Cooperative Agreements is also inconsistent with their prior actions, including but not limited to the fact that, prior to the change in presidential administrations, FRA had consistently determined that the Authority was in compliance with the Cooperative Agreements, including in a Monitoring Report issued less than nine months ago.

127.    Plaintiff is informed and believes and thereupon alleges that Defendants' termination decision was not based on an examination of the relevant data, and that Defendants did not provide or articulate a satisfactory explanation for their action, including a rational connection between the facts found and the choice made.  Rather, the decision was predetermined and precipitated by President Trump's overt hostility to California and its Governor, its challenge to his border wall initiative and other policies, and what he has called the "green disaster" high-speed rail project.

128.    Defendants' unilateral decision to terminate the FY10 Cooperative Agreement and the FSP Cooperative Agreement and to refuse to continue the cooperative work on the EOS also

33

is directly contrary to the statutory requirement and congressional mandate that the Secretary "make grants for high-speed rail projects . . . and capital investment grants to support intercity passenger rail service," Pub. Law 11-117, 123 Stat. at p. 3056 (Dec. 16, 2009), and to the congressional authorization of grants to "project[s] to expand or establish new intercity passenger rail service," with preference for projects that have been selected for the Corridor Identification and Development Program. 49 U.S.C. § 24911(c), (d). FRA's termination of the FY10 Cooperative Agreement and the FSP Cooperative Agreement will cause significant damage to California's high-speed rail program.

129.    The funds appropriated by Congress and obligated to the Authority in the FY10 Cooperative Agreement and the FSP Cooperative Agreement are a specific *res.* Should Defendants be allowed to re-obligate or transfer those funds to another grantee or project, this case may become moot, resulting in irreparable harm to the Authority.

130.    Accordingly, the Court should set aside FRA's termination decision and preliminarily and permanently enjoin Defendants from re-obligating or otherwise transferring the funds to other activities, programs, or recipients.

## PRAYER FOR RELIEF

WHEREFORE, the Authority respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.    That the Court issue a judicial declaration that Defendants' decision to terminate the FY10 Cooperative Agreement and the FSP Cooperative Agreement was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

2.    That the Court enter a judgment setting aside the termination decision;

3.    That the Court enter a preliminary injunction, followed by a permanent injunction, enjoining Defendants from re-obligating the grant funds to another grantee or otherwise transferring the funds; and

4.    That the Court grant such other relief as the Court may deem just and proper.

Dated: July 17, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
CHRISTOPHER J. KISSEL
Deputy Attorney General

/s/ Sharon L. O'Grady
SHARON L. O'GRADY (SBN 102356)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102
  Telephone: (415) 510-3834
  Fax: (415) 703-1234
  E-mail: Sharon.OGrady@doj.ca.gov
*Attorneys for California High-Speed Rail
Authority*

35

Complaint for Declaratory and Injunctive Relief