1    ROB BONTA
     Attorney General of California
2    PAUL STEIN
     Supervising Deputy Attorney General
3    CARTER JANSEN, State Bar No. 347116
     SHARON O'GRADY, State Bar No. 102356
4    Deputy Attorneys General
       455 Golden Gate Avenue, Suite 11000
5      San Francisco, CA  94102-7004
       Telephone: (415) 510-3834
6      Fax: (415) 703-1234
       E-mail: Sharon.OGrady@doj.ca.gov
7    *Attorneys for Plaintiff California High-Speed Rail*
     *Authority*

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13   **CALIFORNIA HIGH-SPEED RAIL**          Case No. 2:25-cv-02004-DAD-CKD
     **AUTHORITY,**
14
                              Plaintiff,
15                                          **PLAINTIFF'S NOTICE OF MOTION**
                                            **AND MOTION FOR PRELIMINARY**
         v.                                 **INJUNCTION; MEMORANDUM OF**
16                                          **POINTS AND AUTHORITIES**

17   **UNITED STATES DEPARTMENT OF**         **[E.D. Local Rule 231(d)]**
     **TRANSPORTATION; SEAN P. DUFFY**, in
18   his official capacity as Secretary of the   Date:         Nov. 17, 2025
     Department of Transportation; **THE**      Time:         1:30 P.M.
19   **FEDERAL RAILROAD**                        Dept:         Courtroom 4/Zoom
     **ADMINISTRATION**; **DREW FEELEY**, in     Judge:        Dale A. Drozd
20   his official capacity as Acting Administrator of   Action Filed:  July 17, 2025
     the Federal Railroad Administration,
21
                              Defendants.
22

23

24

25

26

27

28

**TABLE OF CONTENTS**

                                                                                    **Page**

Notice of Motion and Motion ........................................................................... 1

Introduction ................................................................................................... 2

Background ..................................................................................................... 4

   I.    The Federal Grants to the California High-Speed Rail Program ........................... 4

   II.   The Authority Is on Schedule to Provide Electrified High-Speed Passenger
         Rail Service on the EOS by December 31, 2033. ................................................. 7

   III.  FRA's Recent Move to Terminate Funding for California High-Speed Rail
         Under President Trump ...................................................................................... 8

   IV.   Procedural History ............................................................................................ 11

Legal Standard ............................................................................................... 12

Argument ........................................................................................................ 13

   I.    Plaintiff Is Likely to Establish that Defendants Violated the Administrative
         Procedure Act. ................................................................................................... 13

         A.    FRA's Explanation for Terminating the Grant Was Pretextual ............... 14

         B.    FRA Did Not Follow a Logical and Reasonable Process in
               Terminating the Cooperative Agreements. ............................................. 16

         C.    The Termination Was a Departure From FRA's Settled Policy. ............. 20

   II.   The Authority Is Likely to Suffer Irreparable Harm if a Preliminary
         Injunction Does Not Issue ................................................................................. 21

   III.  The Public Interest and Balance of the Equities Favor a Preliminary
         Injunction ........................................................................................................... 22

Conclusion ...................................................................................................... 23

1

**TABLE OF AUTHORITIES**

2

**Page**

3

CASES

4

5

*Air Alliance Houston v. EPA*
    906 F.3d 1049 (D.C. Cir. 2018) ........................................................................ 19

6

*Alaska Dep't of Envtl. Conservation v. EPA*
    540 U.S. 461 (2004) ........................................................................................... 13

7

8

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*
    522 U.S. 359 (1998) ........................................................................................... 16

9

*Block v. Cmty. Nutrition Inst.*
    467 U.S. 340 (1984) ........................................................................................... 13

10

11

*Bowen v. Massachusetts*
    487 U.S. 879 (1988) ........................................................................................... 21

12

*Burlington Truck Lines, Inc. v. United States*
    371 U.S. 156 (1963) ........................................................................................... 14

13

14

*California v. U.S. Department of Transportation*
    Case No. 3:19-cv-2754-JD, Dkt. No. 1 (N.D. Cal., May 21, 2019) ................... 5, 8

15

16

*City & Cty of San Francisco v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ...................................................................... 21, 22

17

*City of Houston v. HUD*
    24 F.3d 1421 (D.C. Cir. 1994) .......................................................................... 21

18

19

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*
    923 F.2d 188 (D.C. Cir. 1991) .......................................................................... 17

20

21

*Community Legal Servs. v. United States*
    137 F.4th 932 (9th Cir. 2025) ............................................................................ 14

22

*County of Suffolk v. Sebelius*
    605 F.3d 135 (2d Cir. 2010) ........................................................................ 21, 22

23

24

*Dep't of Homeland Security v. Regents of Univ. of Cal.*
    591 U.S. 1 (2020) ............................................................................................... 13

25

*Department of Commerce v. New York*
    588 U.S. 752 (2019) ..................................................................................... 14, 15

26

27

*eBay Inc. v. MercExchange, L.L.C.*
    547 U.S. 388 (2006) ........................................................................................... 21

28

---

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*F.C.C. v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) ............................................................................. 19, 20

4

*FCC v. Prometheus Radio Project*
    592 U.S. 414 (2021) ..................................................................................... 13

5

6

*Fraihat v. ICE*
    16 F.4th 613 (9th Cir. 2021) ........................................................................ 13

7

*FTC v. Sperry & Hutchinson Co.*
    405 U.S. 233 (1972) ..................................................................................... 14

8

9

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*
    546 U.S. 418 (2006) ..................................................................................... 23

10

*Guertin v. United States*
    743 F.3d 382 (2d Cir. 2014) ........................................................................ 16

11

12

*Heckler v. Chaney*
    470 U.S. 821 (1985) ..................................................................................... 14

13

14

*Hendricks* v. *Bank of America, N. A.*
    408 F.3d 1127 (9th Cir. 2005) ..................................................................... 22

15

16

*In re Estate of Ferdinand Marcos, Human Rts. Litig.*
    25 F.3d 1467 (9th Cir. 1994) ....................................................................... 22

17

18

*INS v. Yueh-Shaio Yang*
    519 U.S. 26 (1996) ....................................................................................... 13

19

*League of Women Voters v. Newby*
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................... 23

20

21

*Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union Local 226 v. N.L.R.B.*
    309 F.3d 578 (9th Cir. 2002) ....................................................................... 16

22

23

*Looney v. E. Tex. R.R. Co.*
    247 U.S. 214 (1918) ..................................................................................... 12

24

*Modoc Lassen Indian Housing Auth. v. U.S. HUD*
    881 F.3d 1181 (10th Cir. 2017) ............................................................. 21, 22

25

26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983) .......................................................................... 13, 16, 19

27

28

Plaintiff's Motion for Preliminary Injunction

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3  *N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*
4  　　727 F.2d 1127 (D.C. Cir. 1984) ................................................................. 14

5  *Nat'l Ctr. for Mfg. Scis. v. United States*
　　114 F.3d 196 (Fed. Cir. 1997) .................................................................... 14

6
7  *Rodriguez v. Carson*
　　401 F. Supp. 3d 465 (S.D.N.Y. 2019) ........................................................ 21

8  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
9  　　240 F.3d 832 (9th Cir. 2001) ..................................................................... 12

10  *Tootle v. Sec'y of Navy*
　　137 F.4th 167 (D.C. Cir. 2006) ................................................................... 14

11
12  *Winter v. NRDC*
　　555 U.S. 7 (2008) ...................................................................................... 12

13  *Woods Petroleum Corp. v. U.S. Dep't of Interior*
　　18 F.3d 854 (10th Cir. 1994) ...................................................................... 14

14
**STATUTES**
15
16  United States Code, Title 5 (5 U.S.C.)
　　§ 702 .......................................................................................................... 21
17  　　§ 704 .......................................................................................................... 13
　　§ 706(2)(A) ............................................................................................ 3, 13
18
**REGULATIONS**
19
20  Code of Federal Regulations, Title 2 (2 C.F.R.)
　　§ 200.208(c) ............................................................................................... 20.
21  　　§ 200.339 .................................................................................................... 20
　　§ 200.339(c) ............................................................................................... 20
22
23  Code of Federal Regulations, Title 49 (49 C.F.R.)
　　§ 18.43(a)(1)-(5) ........................................................................................ 20

24  **OTHER AUTHORITIES**

25  Cal. S.B. 840, ch. 121 (Sept. 19, 2025) ................................................................ 18

26  Cal. Assemb. B 1207, ch. 117 (Sept. 19, 2025) .................................................... 18

27
28

Plaintiff's Motion for Preliminary Injunction

### TABLE OF AUTHORITIES
**(continued)**

**Page**

*Newsweek*, "Trump Admin Delivers Another Major Blow to California High
Speed Rail," https://www.newsweek.com/trump-high-speed-rail-california-
funding-2120113 ........................................................................................................ 11

*Politico*, "Trump pulls federal funds for California's high-speed rail,"
https://www.politico.com/news/2025/07/16/trump-california-high-speed-rail-
00459191......................................................................................................................... 11

*Streetsblog California*, "Trump Turns Firehose of Disinformation on California
High-Speed Rail," https://cal.streetsblog.org/2025/02/05/trump-turns-firehose-
of-disinformation-on-california-high-speed-rail ....................................................... 8

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on November 17, 2025, at 1:30 PM, or as soon thereafter as the matter may be heard before the Honorable Dale A. Drozd, United States District Court Judge for the Eastern District of California, Courtroom 4, 501 I Street, Sacramento, CA 95814, Plaintiff will and hereby does move for a preliminary injunction prohibiting Defendants from awarding, obligating or transferring any portion of the grant funds at issue in this case to another recipient(s) during the pendency of this lawsuit.

The motion is brought on the grounds that, absent a preliminary injunction, Defendants will award the grants funds at issue to another recipient(s) before Plaintiff's claims can be adjudicated, thereby mooting some or all of this lawsuit, and causing irreparable harm to Plaintiff. This motion is made pursuant to Federal Rule of Civil Procedure 65; Local Rule 231(d); the Complaint; the below memorandum of points and authorities; the concurrently filed declarations; the proposed order; and any other material or argument the Court deems proper.

The undersigned counsel certifies that she met and conferred with counsel for Defendants on October 6, 2025, and discussed the grounds for this motion. The parties were unable to resolve the dispute, and meet and confer efforts have been exhausted.

Dated:  October 10, 2025                         Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General


/s/ Sharon O'Grady
_____
SHARON O'GRADY
CARTER JANSEN
Deputy Attorneys General
*Attorneys for Plaintiff*
*California High-Speed Rail Authority*

1

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**INTRODUCTION**

3      Defendants have unlawfully stripped $4 billion in grant funding from Plaintiff California

4  High-Speed Rail Authority (the "Authority") and recently started the process for transferring

5  approximately $2.4 billion of that money to other projects.  If Defendants transfer the funds to

6  other recipients before the Authority's challenge to the grant terminations can be decided, the

7  case will be moot, irreparably harming the Authority and dealing a severe blow to a historic

8  public works project that promises to transform the Central Valley and the state's transportation

9  network.  To prevent Defendants from effectively immunizing their misconduct from judicial

10  review, the Court should enter a preliminary injunction that prevents Defendants from re-

11  obligating or otherwise disposing of the funds during the pendency of this case.

12      On July 16, 2025, Defendant Federal Railroad Administration ("FRA") precipitously

13  terminated two Cooperative Agreements that provide critical support for California's historic

14  high-speed rail program.  This was a jarring, 180-degree turnabout by FRA.  One of the

15  cooperative agreements, which obligated the bulk of the funding at issue, was issued just ten

16  months earlier, in September 2024.  Shortly after that, in October 2024, FRA reviewed the

17  Authority's progress and issued a monitoring report that found <u>no</u> "fraud, waste, abuse, or other

18  significant findings that would impact project completion or compliance with the terms and

19  conditions of the cooperative agreements."  After President Trump took office for his second

20  term, however, FRA suddenly came to the opposite conclusion—not because of any actual non-

21  compliance by the Authority, but simply because of President Trump's animosity toward

22  California and the project.

23      In February 2025, just four months after FRA gave the Authority a clean compliance

24  review, President Trump announced, "we are going to start an investigation" of the project,

25  which, he wrongly asserted, was "[b]illions and billions, hundreds of billions of dollars over

26  budget," with "hundreds of billions of dollars of cost overruns."[1]  Shortly after that, President

27

28      [1] *See* https://youtu.be/1hWZ8oG_x9I?si=OqWCIRJbt_CnusW1&t=1134.

2

1    Trump's new Secretary of Transportation Sean Duffy insinuated without evidence that the project

2    was riddled with fraud:  "Who got rich?  What consultants? What politicians? What politicians'

3    husbands got rich off this money?"[2]

4         Secretary Duffy directed FRA to initiate a "compliance review" of the Authority's federal

5    grants, but the outcome of the "review" was predetermined.  While the review was ongoing, and

6    the Authority was still producing information and documents to FRA, Trump and Duffy

7    continued to lambaste the project in social media posts and Oval Office diatribes.  And, nearly

8    simultaneously with the inevitable announcement of the grant terminations, the President posted

9    on Truth Social that "not a SINGLE penny in Federal Dollars will go towards this Newscum

10   SCAM ever again."[3]

11        In its final decision, FRA purported to base the termination on a conclusion that the

12   Authority will not complete construction and commence passenger service on the first segment of

13   the system—a 171-mile stretch between Merced and Bakersfield called the Early Operating

14   Segment or EOS—by December 2033, a critical milestone under the Cooperative Agreements.  In

15   other words, FRA has found the Authority to be in "breach" of its commitments to complete the

16   EOS by 2033, even though (1) just last October, FRA itself confirmed that the Authority was on

17   schedule to meet the deadline, and (2) the deadline is more than eight years away.

18        The Authority will show in this case that the termination of the cooperative agreements has

19   nothing to do with the facts on the ground, and that the real motive underlying FRA's action is

20   political and personal: to punish California for opposing President Trump's policies, and vent the

21   President's long-standing hostility toward the California high-speed rail project.  The termination

22   violates the Administrative Procedure Act ("APA") because the asserted reasons for the decision

23   were pretextual, and the decision was "arbitrary, capricious, an abuse of discretion, or otherwise

24   not in accordance with law."  5 U.S.C. § 706(2)(A).

25

26

27   _____
     [2] *See* Declaration of Carter M. Jansen ("Jansen Decl."), Exh. H (February 20, 2025, X post
     by Secretary Sean Duffy, available at https://x.com/SecDuffy/status/1892703826580316475).

28   [3] Jansen Decl. Exh. J (July 16, 2025, Truth Social post by President Donald Trump,
     available at https://truthsocial.com@realDobaldTrump/posts/114865506222851432).

1    Absent a preliminary injunction, however, the case could be over before it starts.  In its

2    termination decision, FRA explicitly threatened to transfer the funds to other projects, stating its

3    intent to "reprogram awarded but unspent Federal funds from terminated awards to other

4    purposes."  Declaration of Shannon Bowley ("Bowley Decl."), Exh. D at 6.[4]  And now, FRA has

5    acted on that threat.  On September 22, 2025, it issued a Notice of Funding Opportunity

6    ("NOFO") that has started the process for re-obligating to other projects nearly $2.4 billion of the

7    funds currently obligated to the California high-speed rail system.  *Id*. ¶ 25 & Exh. J.

8    Applications for this money are due by January 7, 2026, and FRA could act any time after that to

9    award the money to another project(s).  *Id*.

10    If FRA re-obligates and transfers the grant funds to another program before the Authority's

11    claims can be heard, the Court will not be able to effectively remedy the Authority's injury, and

12    the case will be moot to the extent of the grant funds re-obligated and transferred.  The APA,

13    however, permits injunctive relief to preserve and protect a specific *res*, such as the grant funds at

14    issue here, and the Court should issue a preliminary injunction to do so now.

15    As shown below, the Authority is likely to prevail on the merits of its claims, the likelihood

16    of imminent, irreparable harm is manifest, and the balance of equities weighs heavily in favor of

17    preserving the status quo by preventing FRA from mooting this case.  Accordingly, the Court

18    should enjoin Defendants from re-obligating or transferring the grant funding to other programs

19    or recipients pending final resolution of this case.

20    **BACKGROUND**

21    **I.    THE FEDERAL GRANTS TO THE CALIFORNIA HIGH-SPEED RAIL PROGRAM**

22    High-speed rail in California began as a story of cooperation between California and the

23    federal government.  In 2008, California voters approved Proposition 1A to provide $9.95 billion

24    in bond funding to begin development of a high-speed rail system in the state.  Declaration of

25    Jamey Matalka ("Matalka Decl.") ¶ 12.  In 2009, FRA awarded the Authority $2.5 billion

26    appropriated by Congress through the American Recovery and Reinvestment Act via a

27    cooperative agreement.  *Id.* ¶ 7.  The next year, FRA awarded the Authority an additional $928

28    _____

[4] Page numbers refer to the entire ECF document's pagination, not internal pagination.

1  million, authorized by Congress in the 2010 Omnibus Appropriations Act (the "FY10

2  Cooperative Agreement").  *Id.*  Both federal grants provided funding for the Authority to begin

3  construction of infrastructure on a 119-mile segment in the Central Valley, called the First

4  Construction Segment ("FCS"). *Id.* ¶¶ 5, 7.

5        In February 2019, cooperation on the project broke down when California and fifteen other

6  states sued the federal government over then-President Trump's announcement that he would use

7  funds that Congress had not appropriated to construct a wall between the United States and

8  Mexico.  The day after the suit was filed, the President, incensed, took to Twitter.  Drawing

9  strained comparisons between the border wall and California's high-speed rail project, the

10  President complained (falsely) that the "failed Fast Train project in California . . . is hundreds of

11  times more expensive than the desperately needed Wall."[5]  The same day, FRA abruptly notified

12  the Authority of its intent to terminate the FY10 Cooperative Agreement.  Jansen Decl. Exh. A.

13        Although the Authority refuted the asserted grounds for termination, *id*. Exh. B, in May

14  2019, FRA notified the Authority that it was terminating the FY10 Cooperative Agreement

15  effective immediately, *id*. Exh. C.  FRA threatened to "solicit new applications for these funds"

16  so that it could award them to other intercity passenger rail projects.  *Id*. Exh. C at 25 n.32. The

17  State of California and the Authority sued, challenging the termination under the APA.

18  *California v. U.S. Department of Transportation*, Case No. 3:19-cv-2754-JD, Dkt. No. 1 (N.D.

19  Cal., May 21, 2019); Jansen Decl. ¶ 12.  After Plaintiff notified defendants that it intended to seek

20  a temporary restraining order, the federal government stipulated that it would not seek to re-

21  obligate, transfer, or award the funds to any other program or recipient except through a new

22  NOFO and award issued in accordance with applicable rules and regulations and standard

23  practices and procedures, obviating the need for emergency relief.  Jansen Decl. Exh. D.  The

24  Authority and the federal government eventually settled the lawsuit in June 2021, Jansen Decl.

25  Exh. E, whereby the FY10 Cooperative Agreement was amended, and all of the previously

26  awarded grant funding was restored.

27  _____

28        [5] Jansen Decl. Exh. G (February 19, 2019, X post by President Donald Trump, available at
   https://x.com/realDonaldTrump/status/1097856727020720128).

To provide passenger high-speed rail service as quickly as possible, and pursuant to the 2021 amendment to the FY10 Cooperative Agreement, the Authority expanded the initial 119-mile segment in the Central Valley to 171 miles, extending from downtown Bakersfield to Merced.  Ruiz Decl. ¶ 6.  The expanded segment, the EOS, will connect three of the largest cities in the Central Valley and provide transportation connectivity to both the San Francisco Bay Area and Los Angeles.  Matalka Decl. ¶ 6.

In 2021, Congress enacted the Infrastructure Investment and Jobs Act, which created the Federal-State Partnership for Intercity Passenger Rail Grant Program ("FSP Program").  In December 2023, FRA awarded the Authority approximately $3 billion from the FSP Program for construction of the EOS, and the parties entered into a Cooperative Agreement for the grant in September 2024 (the "FSP Cooperative Agreement").  Matalka Decl. ¶ 7 & Exhs. B, C.  The FSP Cooperative Agreement is a "phased" award.  When it was first executed in September 2024, FRA obligated approximately $1.7 billion in funding to the Authority.  Matalka Decl. ¶ 7 & Exh. B.  In November 2024, FRA and the Authority executed Amendment 1, obligating a second round of $681 million in funding.  Matalka Decl. ¶ 7 & Exh. C.  An additional $681 million has not yet been obligated.  Matalka Decl. ¶ 7.

The performance period of the FSP Cooperative Agreement runs through July 2034, and requires the Authority "to complete the construction of the fully electrified, dedicated high-speed infrastructure for the EOS and provide electrified high-speed passenger service on the EOS by December 31, 2033."  Matalka Decl., Exh. B at 78.[6]

## II.    THE AUTHORITY IS ON SCHEDULE TO PROVIDE ELECTRIFIED HIGH-SPEED PASSENGER RAIL SERVICE ON THE EOS BY DECEMBER 31, 2033.

The Authority has made significant progress on the project and is on schedule to provide electrified high-speed passenger rail service on the EOS by December 31, 2033.  Matalka Decl.

---

[6] FRA and the Authority also signed three other, smaller cooperative agreements in 2024, funding specific elements of the EOS, and FRA awarded an additional grant for a grade separation in the Central Valley in January 2025 (the "Le Grand Overcrossing Grant").  Declaration of Shannon Bowley ("Bowley Decl.") ¶ 8.  On August 26, 2025, FRA abruptly revoked the Le Grand Overcrossing Grant, which would have supported a rail safety project to separate cars, trucks, bicycles and pedestrians from existing freight and passenger rail tracks, as well as future high-speed rail tracks.  Id. ¶ 24 & Exh. I.

¶ 38 & Exh. I.  The Authority has resolved the most complex and difficult issues arising in connection with EOS, and construction is well-advanced.  Declaration of Daniel Teran ("Teran Decl.") ¶¶ 8-11 & Exh. A; Ruiz Decl. ¶¶ 7-12 & Exh. A.  More than 99 percent of the parcels needed for the right-of-way in the FCS have been acquired and 86 percent of utility relocations have been completed.  Teran Decl. ¶¶ 9, 10.[7]  In terms of physical construction, as of May 31, 2025, the Authority has completed 54 major structures—viaducts, bridges, overhead crossings and underpasses.  Ruiz Decl. ¶ 9 & Exh. A; Teran Decl. Exh. A at 3.  Each of these completed structures was a significant undertaking; for example, the San Joaquin River viaduct is 4,741 feet long, 43 feet wide and 210 feet tall at its highest point.  Ruiz Decl. ¶ 12.  As of May 31, 2025, construction is underway on another 30 major structures, with only 8 major structures not yet under construction.  Ruiz Decl. ¶ 9; Teran Exh. A at 3.  In addition, the Authority has constructed hundreds of irrigation and wildlife crossings.  Ruiz Decl. ¶ 10.  The Authority has completed approximately 70 miles of guideway for the laying of track, with an additional 27 miles under construction as of the end of May 2025.  Ruiz Decl. ¶ 11; Teran Exh. A at 3.  And the Authority is nearing completion of a railhead, or depot, for delivery of track to the project, due for completion this year.  Ruiz Decl. ¶ 9.

The Authority issued an amended request for proposals for acquisition of rolling stock on September 9, 2025, with the contract to be executed by December 1, 2025.  Matalka Decl. ¶ 38.  That revised timeline, although later than the original December 2024 date for procurement contract execution, will still allow for timely trainset delivery, and will not affect the Authority's ability to achieve passenger service on the EOS by December 2033.  *Id*. ¶ 38 & Exh. J.

### III.    FRA'S RECENT MOVE TO TERMINATE FUNDING FOR CALIFORNIA HIGH-SPEED RAIL UNDER PRESIDENT TRUMP

As noted above, FRA cooperation on the project came to a halt during President Trump's first term in office when California and other states challenged President Trump's attempt to use

---

[7] The Authority has had to engage in extensive utility relocation work (moving electric, gas, telecommunications, water, sewer and irrigation infrastructure), which has required the cooperation of dozens of utility owners.  Teran Decl. ¶ 10.  As of May 31, 2025, the Authority had relocated 1572 of 1,826 utilities to date that are necessary to construct the initial 119-mile FCS, and an additional 102 utility relocations were underway. *Id.*, Exh. A.

unappropriated funds for a U.S.-Mexico border wall.  See *supra* at 5.  It resumed after the

settlement in *California v. U.S. Department of Transportation*, and FRA began working closely

with the Authority again, reviewing and approving requests for grant disbursements, conducting

site visits and monthly update meetings between Authority staff and their FRA counterparts, and

participating in quarterly senior management meetings.  Bowley Decl. ¶ 11.  Pursuant to the

Cooperative Agreements, the Authority provided FRA with regular reports about every aspect of

the project, Bowley Decl. ¶ 12, and FRA periodically reviewed the Authority's risk analyses.

Matalka Decl. ¶¶ 22-23.  The FRA also conducted annual site reviews and issued formal reports.[8]

Matalka Decl. ¶ 31; Bowley Decl. ¶ 13.  As noted above, the FRA's most recent monitoring

report, issued in October 2024, states: "*FRA did not identify any significant findings that would*

*impact project completion or compliance with the terms and conditions of the cooperative*

*agreements*."  Matalka Decl. Exh. H at 5 (emphasis added).

President Trump's campaign of retaliation against California resumed in earnest just days

after his second inauguration, however, and he immediately began making vague (and false)

allegations about the project—that it was riddled with "kickbacks" and "corruption," that the

project is "hundreds of billions of dollars" over budget, that an airplane trip from San Francisco to

Los Angeles costs only $2, and that hundreds of billions of dollars could be saved by transporting

people back and forth between Los Angeles and San Francisco by limousine.[9]

Two weeks later, in mid-February, Transportation Secretary Duffy announced that DOT

would "investigat[e] how California spent roughly $4 billion from Biden,"[10] even though less

than 0.05 percent, or only about $1.4 million, of federal funds have been disbursed to the

Authority under the FSP Agreement, and the Authority has not received any disbursements under

the FY10 Agreement.  Matalka Decl. ¶ 7.  Duffy insinuated without evidence that the project was

---

[8] The monitoring site reviews stopped during the prior litigation between the Authority and FRA and recommenced in 2024.

[9] *Streetsblog California*, "Trump Turns Firehose of Disinformation on California High-Speed Rail," https://cal.streetsblog.org/2025/02/05/trump-turns-firehose-of-disinformation-on-california-high-speed-rail.

[10] *See* Jansen Decl. Exh. I (April 29, 2025, X post by Secretary Sean Duffy, available at https://x.com/SecDuffy/status/1917263711963865321).

1   rife with fraud, waste or abuse, stating: "Who got rich?  What consultants?  What politicians?

2   What politicians' husbands got rich off this money?"[11]

3        On February 20, 2025, FRA initiated a review of the Authority's compliance with the

4   terms of its federal grants.  The Authority timely complied with FRA's multiple requests for

5   documents, producing more than 80,000 pages, compiled from nearly 2,500 files, on a very

6   compressed schedule.  Bowley Decl. ¶¶ 15, 16 & Exhs. A, B, C.

7        Not surprisingly, this compliance review was an elaborate show by FRA, which had no

8   real interest in investigating the facts.  While the compliance review was *still ongoing*, both

9   President Trump and Secretary Duffy made public statements that left no doubt they had already

10  made up their minds to cut off federal funding for the project, regardless of the outcome of the

11  compliance review.  On May 6, 2025, in an Oval Office meeting with the Canadian Prime

12  Minister unrelated to California or high-speed rail, President Trump railed at Governor Newsom,

13  referring to him as "Newscum," and excoriated the high-speed rail project again, stating that he

14  had told the Secretary of Transportation:  "[W]e're not going to pay for that thing."[12]

15       On June 4, 2025, FRA issued a Notice of Proposed Determination to terminate the FY10

16  and FSP Cooperative Agreements, accompanied by a Compliance Review Report.  Bowley Decl.

17  Exh. D.  Notably, the Notice of Proposed Determination and Compliance Review Report found

18  no past or even imminent breach of any material term of either Cooperative Agreement.  *See id.*

19  Rather, FRA asserted that the Authority will not be able commence passenger rail service on the

20  EOS by December 2033—even though FRA found no evidence of that just nine months earlier in

21  October 2024, and the performance deadline is more than eight years away.  In other words, FRA

22  asserted that the Authority is in default *now* by effectively looking into a crystal ball and

23  declaring, eight years in advance, that the Authority cannot possibly meet the deadline.

24       Despite Secretary Duffy's prior insinuations, the Compliance Review Report disclosed no

25  wrongdoing in connection with the project.  Nor did it offer any explanation for reaching a

26  ───────────────

    [11] Jansen Decl. Exh. H (February 20, 2025 X post by Secretary Sean Duffy, available at

27  https://x.com/SecDuffy/status/1892703826580316475).

    [12] *See* President Trump to Canadian Prime Minister Mark Carney:

28  https://www.youtube.com/watch?v=QY6JPmOKQlo.

1  different conclusion from FRA's October 2024 monitoring report.  Instead, the Compliance

2  Review Report bears all of the hallmarks of a post hoc justification; it simply echoes the broad

3  statements in the Notice of Proposed Determination that the Authority "is not likely to achieve its

4  commitment to deliver the EOS by 2033." Bowley Decl. Exh. D at 7.

5       The Notice of Proposed Determination gave the Authority seven days to respond and 30

6  days to submit supporting documentation.  The Authority timely responded and provided

7  voluminous evidence refuting the FRA's claims.  Bowley Decl. Exhs. E, F.  The Authority

8  demonstrated, most importantly, that it remains on schedule to timely commence revenue service

9  on the EOS by December 31, 2033. Matalka Decl. ¶ 38 & Exh. I.

10      Underscoring that the fix was in, on July 8, 2025, just *hours* after the Authority submitted

11  its detailed response to the proposed termination and thousands of pages of supporting evidence,

12  President Trump and Secretary Duffy made clear, yet again, that termination was a foregone

13  conclusion.  Secretary Duffy indicated that FRA would terminate the agreements within about

14  five days, stating "Stay tuned for – probably give us five days – and you'll have an answer on

15  what's gonna happen with the $4 billion dollars we have . . . that's gonna be $120 billion that will

16  never connect San Francisco to L.A."[13]  President Trump also repeated the same old baseless

17  talking points, stating that it was "a cost overrun of 2,000%— something like that. It's unlimited."

18  "It's like throwing it out the window... Not one track has been laid. $15 billion, and we're 16

19  years into the project. Not one track."[14]

20    [13] President Trump Participates in Cabinet Meeting, July 8, 2025," The White House,
   https://www.youtube.com/live/vL6PaBTA418?t=4830s.

21    [14] *See* https://www.youtube.com/live/vL6PaBTA4I8?t=4830s.  Secretary Duffy has
   repeatedly criticized the Authority because track has not yet been laid, intimating that no
22  meaningful work has yet occurred.  *See, e.g.,* President Trump Participates in Cabinet Meeting,
   July 8, 2025," The White House, https://www.youtube.com/live/vL6PaBTA418?t=4830s; Jansen
23  Decl. Exh. K (July 30, 2025, X post by Secretary Sean Duffy, available at
   https://x.com/SecDuffy/status/1950618398116700422); *Newsweek,* "Trump Admin Delivers
24  Another Major Blow to California High Speed Rail," https://www.newsweek.com/trump-high-
   speed-rail-california-funding-2120113. This criticism is not only baseless, but also reveals a
25  fundamental misunderstanding of the way the Cooperative Agreements are structured.  Track
   laying is one of the final steps of the construction process and can commence only after planning,
26  land acquisition, environmental clearances, construction of supporting structures (e.g., bridges,
   viaducts, and overpasses), and construction of guideway. For that very reason, the Cooperative
27  Agreements do not require tracklaying to be completed until June 30, 2032.  *See* Matalka Decl.
   Exh. B at 25.
28

On July 16, 2025, FRA notified the Authority that it was terminating the Cooperative Agreements effective that day. It asserted, again, that the decision was based on its conclusion that the Authority "will not be able to deliver the operation of a Merced-to-Bakersfield corridor by the end of 2033." Bowley Decl. Exh. G at 2. It explained that "the mere promise of delivering the EOS *someday* and at *some cost* was not the bargain struck." *Id*. at 13 (emphasis in original). But the Authority has never indicated that it plans to deliver the EOS "someday." The Authority remains committed to delivering the EOS by the end of 2033, as required under the FSP Cooperative Agreement, and is on schedule to do so.

In short, FRA's actions now—just like six years ago—are entirely unjustified by the evidence. They reflect prejudging the outcome prior to (and regardless of) consideration of the record. Indeed, the same hour that FRA informed the Authority of its final termination decision, the President posted on Truth Social that "[t]hanks to Transportation Secretary Sean Duffy, not a SINGLE penny in Federal Dollars will go towards this Newscum SCAM ever again."[15]

## IV. PROCEDURAL HISTORY

The Authority filed this lawsuit on July 17, 2025—the day after the final termination decision—and shortly thereafter gave notice to Defendants of its intent to seek a temporary restraining order. That became unnecessary when Defendants stipulated, as they did in the previous grant termination litigation between the parties, that they would not seek to re-obligate, transfer, or award the funds to another recipient(s) except through a new Notice of Funding Opportunity (NOFO) and award. *See* ECF No. 8. The purpose of the stipulation was to obviate the need for emergency relief by giving the Authority sufficient time to seek a preliminary injunction if Defendants took steps to reobligate the grant monies. *Id*. Defendants have now taken that step.

On September 22, 2025, Defendants filed a motion to dismiss, which remains pending. ECF No. 12. The same day, Defendants issued a NOFO to award and reobligate all of the

---

[15] *See* Jansen Decl. Exh. J (July 16, 2025, Truth Social post by President Donald Trump, available at https://truthsocial.com/@realDonaldTrump/posts/114865506222851432); *Politico*, "Trump pulls federal funds for California's high-speed rail," https://www.politico.com/news/2025/07/16/trump-california-high-speed-rail-00459191.

1    obligated but undisbursed funds under the FSP Cooperative Agreement—nearly $2.4 billion.

2    Bowley Decl. ¶ 25 & Exh. J.  Applications for the money are due January 7, 2026.  *Id.*  Unless

3    enjoined, Defendants will be free to award and reobligate the Authority's FSP grant funds to

4    other projects any time thereafter.

5         On October 6, 2025, the parties met and conferred with respect to this motion. Jansen

6    Decl. ¶ 5.  Defendants indicated that they intended to seek a stay of this motion (but not of their

7    pending motion to dismiss).  *Id.*  Plaintiff indicated it would not oppose a stay provided

8    Defendants agreed that FRA would not reobligate the $2.5 billion of funds obligated under the

9    FSP Cooperative Agreement until after the stay was lifted and this Court issued a ruling on this

10   motion.  *Id.*  On October 9, 2025, Defendants advised Plaintiff that they would not stipulate.  *Id.*

11   ¶ 6.

12                                **LEGAL STANDARD**

13        District courts have "broad discretion" to issue temporary injunctive relief "to preserve the

14   status quo and prevent irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

15   F.3d 832, 841, n.8 (9th Cir. 2001).  It is a "familiar and long-established practice" to order a

16   preliminary  injunction "for the purpose of protecting and preserving [the Court's] jurisdiction

17   until the object of the suit is accomplished and complete justice done between the parties."

18   *Looney v. E. Tex. R.R. Co.*, 247 U.S. 214, 221 (1918).

19        On a motion for preliminary injunction, a plaintiff "must establish [1] that he is likely to

20   succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary

21   relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public

22   interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Stuhlbarg*, 240 F.3d at 839 n.7 (9th Cir. 2001).

23   The Ninth Circuit has adopted a "sliding scale" approach: A plaintiff need only show "serious

24   questions" on the merits if it can also show a likelihood of irreparable injury, that an injunction is

25   in the public interest, and that the balance of hardships tips sharply toward the plaintiff. *Fraihat*

26   *v. ICE*, 16 F.4th 613, 635 (9th Cir. 2021).

27

28

1

**ARGUMENT**

2

**I.    PLAINTIFF IS LIKELY TO ESTABLISH THAT DEFENDANTS VIOLATED THE ADMINISTRATIVE PROCEDURE ACT.**

3

4

The Authority is likely to prevail on its APA claim.  As an initial matter, the decision to

5

terminate the Cooperative Agreements and de-obligate funding awarded to the Authority

6

constitutes final agency action subject to judicial review under the APA.  5 U.S.C. § 704; *see also*

7

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984) (noting "presumption in favor of judicial

8

review of administrative action").  An agency action is final if it marks the "consummation of the

9

agency's decisionmaking process" and "determine[s] rights or obligations." *Alaska Dep't of*

10

*Envtl. Conservation v. EPA*, 540 U.S. 461, 483 (2004) (quotation marks omitted).  These

11

requirements are plainly satisfied here.  FRA's July 16 final decision consummates the agency's

12

abbreviated decision-making process and determines the Authority's rights; it begins: "This letter

13

provides . . . [the Authority] with the final decision of the . . . [FRA] to terminate [the]

14

Cooperative Agreements . . . ."  Bowley Decl.  Exh. G at 2.

15

On the merits, the Authority is likely to prevail on its claim that FRA's termination decision

16

was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

17

5 U.S.C. § 706(2)(A).  "The APA's arbitrary-and-capricious standard requires that agency action

18

be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423

19

(2021).  Agency actions are arbitrary and capricious if they, *inter alia*, irrationally depart from

20

settled policy, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996), or offer pretextual explanations

21

that run counter to the evidence, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

22

U.S. 29, 43 (1983).  Moreover, when an agency changes its position, it must first consider both

23

the "alternatives that are within the ambit of the existing policy" and the "serious reliance

24

interests" engendered by the status quo. *Dep't of Homeland Security v. Regents of Univ. of Cal.*,

25

591 U.S. 1, 30 (2020).  As set forth below, FRA's final termination decision falls short of

26

reasoned decision-making in several ways.[16]

27

_____

[16]  In their pending motion to dismiss, Defendants do not contend that the Complaint fails
to state a claim.  Instead, they seek to have the case dismissed on jurisdictional grounds, arguing:

28

(continued…)

**A.    FRA's Explanation for Terminating the Grant Was Pretextual.**

Where an agency has concealed the basis for its decision through pretext, a reviewing court need not accept the agency's stated rationale.  *See Department of Commerce v. New York*, 588 U.S. 752, 781-83 (2019); *FTC v. Sperry & Hutchinson Co*., 405 U.S. 233, 248-49 (1972) (reversing order affirming agency action where the "considerations urged here in support of the Commission's order were not those upon which its action was based" (internal quotation marks omitted)).  Moreover, because the APA requires an agency decision-maker to "disclose the basis of its" decision, *Burlington Truck Lines*, 371 U.S. 156, 168 (1963) (citation omitted), a pretextual decision must be set aside without further inquiry.  *See Department of Commerce v. New York*, 588 U.S. at 782-783; *N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984); *see also Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (invalidating decision as arbitrary and capricious where rejection of agreement was pretext for ulterior motive).

"The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com*, 588 U.S. at 785.  Indeed, in *Department of Commerce v. New York*, the Supreme Court held that *even though the agency decision was supported by the evidence*, reversal was still required because the decision "rested on a pretextual basis."  *Id.* at 773-76, 781-84.

Here, FRA's stated rationales for terminating the cooperative agreements are mere pretexts for the Trump administration's actual motive: political retribution for California's opposition to

---

(1) that the cooperative agreements are contracts that, under the Tucker Act, are within the exclusive jurisdiction of the Court of Federal Claims; and (2) that FRA's termination decision is committed to agency discretion and therefore nonreviewable under the APA.  As will be further explained in the Authority's opposition to that motion, "there cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act."  *Community Legal Servs. v. United States*, 137 F.4th 932, 939 (9th Cir. 2025) (quoting *Tootle v. Sec'y of Navy*, 137 F.4th 167, 177 (D.C. Cir. 2006)).  Lawsuits based on cooperative relationships and not seeking money damages, as here, generally are not within the jurisdiction of the Court of Federal Claims.  *See, e.g., Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199-202 (Fed. Cir. 1997).  As to Defendants' second ground for dismissal, review under the APA is unavailable only "where a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Here, FRA based its termination decision on specific findings which plainly are susceptible to judicial review.

President Trump on a wide range of policy issues, and President Trump's overt animus to California Governor Newsom and what he has termed the "green disaster" high-speed rail project.[17]

The Supreme Court's decision in *Department of Commerce v. New York* is instructive. That case was a challenge to the decision of the Secretary of Commerce to reinstate a citizenship question on the census. 588 U.S. at 758. The Trump administration's claimed rationale was that doing so would be the best way of collecting improved citizenship data for use by the Department of Justice in enforcing the Voting Rights Act. *Id.* at 775-76. While the Court found that the agency's rationale was supported by evidence, *id.* at 774, it held that reversal and remand was nonetheless required because there was evidence that the reason for the decision was pretextual, *id.* at 785. Among other things, the Secretary began taking steps to reinstate the citizenship question only about a week into his tenure, with no indication that he was considering Voting Rights Act enforcement, and his Director of Policy "saw it as his task to 'find the best rationale'." *Id.* at 783 (quoting the district court's decision).

Similarly, President Trump's and Secretary Duffy's public statements make it manifest that they were determined to terminate federal support for California's high-speed rail program from the very beginning of the new administration. See *supra* at 8-9. As discussed above, one of Duffy's first acts as Secretary of Transportation was to launch a compliance review to try to find fraud or corruption, or some other basis for terminating the grants, notwithstanding the fact that FRA's own monitoring report, issued just four months earlier, concluded that there was none. Matalka Decl. Exh. H. The facts on the ground, and the reasoned decision-making process required by the APA, simply didn't matter to Defendants.

Then, in apparent obedience to President Trump and Secretary Duffy's directives, FRA concluded the Authority cannot complete the EOS on time—the opposite of what FRA concluded just a few months before—*without any explanation for the rapid about face*. Similarly, although FRA had recently reviewed the Authority's 2023 risk analysis and found it to be "robust" and

---

[17] *See* Jansen Decl. Exh. F (February 13, 2019 X Post by President Donald Trump, available at https://x.com/realDonaldTrump/status/1095857587344551936).

1    "thorough," Matalka Decl. ¶ 23 & Exh. G at 13, 19, FRA ginned up a new "risk analysis" that

2    concluded that "on average, HSRA is expected to miss the required EOS start date." Bowley

3    Decl. Exh. G at 9.[18]  In other words, FRA chose to reverse its own prior findings made just

4    months before, and terminated the Cooperative Agreements immediately, based on ill-founded

5    speculation concerning an event more than eight years into the future.

6         The Authority is likely to succeed on its APA claim because FRA's stated reasons for

7    terminating the grants are pretextual.  During his first administration, President Trump's

8    administration tried to cut off federal funding for California high-speed rail as a matter of political

9    retribution, and it is now determined to finish the job, regardless of the evidence.

10        **B.    FRA Did Not Follow a Logical and Reasonable Process in Terminating the
            Cooperative Agreements.**

11

12        FRA's decision also violated the APA because it did not result from a logical and

13   reasonable process.  The APA establishes a scheme of "reasoned decisionmaking." *Motor Vehicle*

14   *Mfrs.*, 463 U.S. at 52.  "Not only must an agency's decreed result be within the scope of its lawful

15   authority, but the process by which it reaches that result must be logical and rational." *Allentown*

16   *Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).  "The focus of this requirement is

17   on the rationality of an agency's decisionmaking process rather than on the actual decision."

18   *Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union Local 226 v. N.L.R.B.*, 309 F.3d

19   578, 583 (9th Cir. 2002).  Thus, for example, an agency may not "rely on explanation that runs

20   counter to the relevant evidence presented to the agency," nor may it rely "solely on portions

21   favorable to its own position."  *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014).

22        The decision-making process that led to termination here was anything but "logical and

23   rational."  The sequence of events demonstrates that FRA was determined to terminate the

24   Cooperative Agreements no matter what evidence or argument the Authority might present, and

25   FRA's final termination decision was not based on the evidence before the FRA.  *City of Kansas*

26   *City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action

27        _____

         [18] FRA's new risk analysis, along with other issues raised in the Compliance Review
28   Report, is addressed at length in the Authority's responses to FRA's Notice of Proposed
     Determination.  Bowley Decl. Exhs. E, F.

based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decision-making and cannot survive review under the arbitrary and capricious standard.").  FRA's termination rationale—that the Authority will not be able to deliver the EOS by the end of 2033—is an *ipse dixit* unsupported by any reliable evidence.  *See* Bowley Decl. Exhs. D, G.

As the Authority explained in its submissions to FRA, FRA's rationale rests on speculation that the Authority will be unable to resolve issues commonly encountered in large construction projects, such as resolving third-party disputes and project change order requests, and on the fact that the Authority deferred finalizing its rolling stock acquisition to reassess technical specifications—delay that will not affect the overall timeline for completing the EOS.  Matalka Decl. ¶ 38 & Exh. J.[19]  Further, FRA gave no explanation why these issues suddenly cried out for immediate termination in July 2025, but were not even worthy of mention in FRA's October 2024 monitoring report.

The FRA's "Schedule and Cost Risk Analysis," included in the Compliance Review Report, also fails to support the FRA's rationale.  *See* Bowley Decl. Exh. D at 58.  The document was ostensibly prepared to inform FRA's review, but it, too bears the hallmarks of post hoc justification for a decision already made.  Among other things, (a) FRA apparently did not use documents and information prepared in the ordinary course of the high-speed rail project, and did not allow the Authority to provide input; (b) it did not consider complete, current information, including the Authority's confidential risk register, even though FRA had access to it; and (3) it omits information critical to any risk assessment, including an adequate description of the model used and the underlying assumptions and exceptions. Matalka Decl. ¶ 27.  Indeed, it fails even to disclose the person(s) who prepared it, much less their qualifications for the task.  *Id*.  The FRA's risk analysis also does not explain why FRA felt the need to create a new risk assessment when, less than two years earlier, FRA had conducted a review of the Authority's own risk assessment

---

[19] Although identified as an interim milestone, failing to procure rolling stock on the timeline spelled out in the grant is not an event of default or persistent noncompliance under the Cooperative Agreements, and thus does not in itself warrant termination of the Cooperative Agreements . *See* Matalka Decl. Exhs A, B, C.

1    and found it to be "robust" and "thorough."  Matalka Decl. Exh. G at 13, 19.  FRA's decision to

2    terminate the grants, based on an opaque and unreliable "risk analysis" opining that, "*on average*,

3    CHSRA is expected to miss the required EOS start date" more than eight years away, Bowley

4    Decl. Exh. G at 9 (emphasis added), is arbitrary and capricious.

5           FRA also ignored the evidence before the agency by repeatedly claiming that the

6    Authority "has no credible plan" for bridging an estimated $7 billion funding shortfall for

7    completing the EOS "beyond seeking additional federal funds."  Bowley Decl. Exh. D at 4, 8, 21-

8    23.[20]  The Authority showed FRA that it had a concrete plan to address the shortfall, set out in the

9    Governor's May 2025 Budget Revision and supported by leaders in the Legislature, by extending

10   the cap-and-invest (formerly cap-and-trade) program to 2045 from 2030, and providing a stable,

11   guaranteed stream of cap-and-invest funding of $1 billion per year for the project.  Matalka Decl.

12   ¶¶ 14-15.  Despite the fact that this proposal was pending before the Legislature, FRA brushed it

13   aside, dismissively concluding it was unlikely to be enacted.  Bowley Decl. Exh. G at 22.  But, of

14   course, the Legislature did pass the legislation just two months later and the Governor signed it,

15   adding guaranteed funding of $15 billion for the project.  Cal. S.B. 840, ch. 121 (Sept. 19, 2025);

16   Cal. Assemb. B. 1207, ch. 117 (Sept. 19, 2025).

17          FRA also ignored that, since the inception of the project, the State has repeatedly

18   demonstrated its commitment to finding the necessary funding.  As of May 31, 2025, the State

19   had expended approximately $11.8 billion of its own funds on the project, compared to federal

20   grant disbursements of approximately $2.6 billion ($2.5 billion of which was received prior to

21   2019).  Matalka Decl. ¶ 11 & Exh. D.  Accounting for future cap-and-invest revenues that are

22   currently dedicated to the project, the State's total commitment to date is approximately $37

23   billion—almost five times the amount of its federal grants.  *Id.*  Nothing in the history of the

24   project suggests that the State will simply let the project fail.

25   _____

26          [20] FRA's notice of proposed termination cited a February 25, 2025 report by the
     Authority's Inspector General in support of its conclusion that the Authority had no credible plan
27   to bridge the funding gap other than additional federal funding.  Bowley Decl. Ex. D at 4.  The
     Inspector General issued a letter in response stating that it "**Has Never Concluded that the**
28   **CHSRA Lacks the Funding to Meet Federal Grant Agreement Requirements**."  Matalka
     Decl. Exh F at 3 (bolded in original).

Indeed, the fact that costs for large projects increase over time, and that project plans may need to be revised to include seeking additional federal or other funding support, is not unusual. The planned Brightline West high-speed rail line from Las Vegas to the Los Angeles area also received a grant from the FSP grant program (for $3 billion).  It just broke ground in April 2024, has not started actual construction, and disclosed in a federal grant application in September 2025 that its estimated cost had increased by over 30 percent—from $16 billion to $21.05 billion. Bowley Decl. ¶ 31 & Exh. K.

The fact that FRA abruptly reversed course from its October 2024 monitoring report, in which it made <u>no</u> "significant findings that would impact project completion or compliance with the terms and conditions of the cooperative agreements," Matalka Declaration Exh. H at 4, is especially damning.  An agency changing course from a previously held position must "supply a reasoned analysis for the change."  *Motor Vehicle Mfrs.*, 463 U.S. at 41-42; *see Air Alliance Houston v. EPA*, 906 F.3d 1049, 1066 (D.C. Cir. 2018) ("[I]f 'new policy rests upon factual findings that contradict those which underlay its prior policy,'" it must provide 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or engendered by the prior policy," quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).  Here, not only has FRA failed to explain why it changed its position, it has not even *acknowledged* that it has changed position.  Its final termination letter states that "[n]othing in the [October 2024] Monitoring Report . . .  indicates that FRA has ever endorsed something short of an operational EOS in the timeline agreed to by [the Authority] as an acceptable project outcome."  Bowley Decl. Exh. G at 17.  But that is a straw man.  No one disputes that the Cooperative Agreements require an operational EOS by December 31, 2033.  The relevant fact is that the October 2024 monitoring report found *no basis for concern that the Authority would not meet that target*, and FRA has not supplied a reasoned analysis why that was wrong at the time, or what changed in the nine months between that finding and FRA's July 16 termination of the agreements that would justify the agency's sudden about face.

### C.    The Termination Was a Departure From FRA's Settled Policy.

Finally, the termination irrationally departs from FRA's ordinary practice.  Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," and "must show that there are good reasons for the new policy.'"  *Fox Television Stations*, 556 U.S. at 515. Yet that is just what FRA has done.

The Department of Transportation's ("DOT") long-time practice, pursuant to its regulations and published guidance for grantees, is to address noncompliance with carefully calibrated remedies.  DOT regulations in effect when the FY10 Cooperative Agreement was executed, for example, did not provide for sudden termination as a remedy for noncompliance.  They required agencies like FRA to utilize measures "appropriate in the circumstances," ranging from "[t]emporarily withholding cash payments" to disallowing the use of funds for "all or part of the cost of the activity not in compliance" or "withholding future awards."  49 C.F.R. § 18.43(a)(1)-(5) (2010).  Uniform grant regulations adopted across the federal government in 2014 provide for the imposition of "specific conditions," 2 C.F.R. § 200.339, such as "additional project monitoring," *id.* § 200.208(c).  *Only* when the agency subsequently "determines that noncompliance cannot be remedied by imposing specific conditions" may it terminate the award "in part or in its entirety." *Id.* § 200.339(c).  DOT's 2009 and 2016 Financial Assistance Manuals and its most recent 2020 Guide to Financial Assistance require remedies modulated to the circumstances, including opportunities to take "corrective action" or "remedial action," rather than immediate termination.  Section 5.5.6 of the DOT's Guide to Financial Assistance, effective January 1, 2020, states: "Except when an immediate termination action is needed to protect the Federal government's interest, the [agency] should terminate an award only when all other possible remedial actions have been exhausted and there is no reasonable expectation that the recipient will complete the necessary corrective actions (2 CFR § 200.339)."

If FRA had had a good faith concern about whether the Authority could obtain the State's commitment to fill the funding gap, or whether the Authority's schedule for completion of the project—now on track for December 2033—could slip in the future, the appropriate remedy would have been to withhold cash payments or temporarily suspend the Cooperative Agreements,

rather than terminate them outright.  Indeed, in the case of the FY10 Cooperative Agreement, no grant disbursements have been made.  Matalka Decl. ¶ 7.  Instead, FRA ignored its settled regulations and policies and rushed headlong to termination in order to make good on President Trump and Secretary Duffy's threats to terminate the grants.

## II.    THE AUTHORITY IS LIKELY TO SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION DOES NOT ISSUE.

If injunctive relief is not granted, the Authority will suffer irreparable injury that cannot be redressed by an award of damages.  *See City & Cty of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  The APA waives the United States's sovereign immunity as to actions against federal agencies seeking relief other than money damages.  5 U.S.C. § 702.  Moreover, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as money damages."  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  Where a grantee is challenging the termination of a grant, it may obtain preliminary injunctive relief under the APA to preserve the specific funds in question.  *See, e.g., County of Suffolk v. Sebelius*, 605 F.3d 135, 138-39 (2d Cir. 2010).  The need for a preliminary injunction urgently arises here because "funds appropriated for an agency's use can become unavailable . . . if the funds have already been awarded to other recipients . . . ."  *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994).[21]  In *Modoc Lassen Indian Housing Auth. v. U.S. HUD*, 881 F.3d 1181, 1195 (10th Cir. 2017), for example, the court held that HUD had improperly stripped grant monies from the plaintiff-tribes, but that the tribes were without a remedy because HUD had already disbursed the funds to other recipients; HUD no longer possessed the "very thing" to which the tribes were entitled.  *Id.* at 1196.  And sovereign immunity prohibited the court from ordering

---

[21] It is not clear whether re-obligation of the funds would be enough to moot the case, or whether actual disbursement of the funds would be required.  That question does not appear to have been squarely addressed by an appellate court.  *See Rodriguez v. Carson*, 401 F. Supp. 3d 465, 468-71 (S.D.N.Y. 2019) (holding as a matter of first impression that it is the disbursement of the funds, not its re-obligation, that divests the district court of authority to grant effectual relief.)  But allowing FRA even just to re-obligate the funds would subject the Authority to the risk that this Court, the Ninth Circuit or the Supreme Court could hold re-obligation was sufficient to prevent this Court from granting effective relief, and would potentially give rise to conflicting claims to monies.

HUD to substitute other funds. *Id.* at 1197. In *County of Suffolk v. Sebelius*, 605 F.3d 135, 138-39 (2d Cir. 2010), the County unsuccessfully sought a preliminary injunction in an APA action to preserve its access to funding under an HHS grant program, and the court of appeal also denied injunctive relief. More than a year later, the court of appeal reversed the district court's order denying the preliminary injunction. *Id.* at 139. On remand, HHS conceded that the County was entitled to the funds, but by that time the case was moot because the funds had been distributed to other grant applicants. *Id.*

Here, FRA has issued a NOFO by which it intends to award most of the grant funds at issue in this case to other projects. If that occurs before the Authority's claims can be adjudicated, the case will be rendered moot as to those funds (or any remaining grant funds that FRA may obligate pursuant to future NOFOs). That is irreparable harm appropriately remedied by injunctive relief.[22] *See In re Estate of Ferdinand Marcos, Human Rts. Litig.,* 25 F.3d 1467, 1477 (9th Cir. 1994) (holding that the district court acted within its authority in granting a preliminary injunction preventing transfer or dissipation of assets); *Hendricks* v. *Bank of America, N. A.,* 408 F.3d 1127, 1140 (9th Cir. 2005) (affirming order preliminarily enjoining bank from releasing funds; holding that the risk of irreparable harm is "virtually self-evident" when a party is at risk of losing its ability to recover assets to which it is entitled).

## III.    THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES FAVOR A PRELIMINARY INJUNCTION

The balance of hardships between the Authority and FRA sharply tilts in favor of granting a preliminary injunction, and the public interest would not be harmed by one. *See City & Cty of San Francisco v. Trump*, 897 F.3d at 1243 (9th Cir. 2018). When injunctive relief is sought with respect to agency action, the reviewing court must balance the actual irreparable harm to the plaintiff against the potential harm to the government. *See Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 429 (2006). Here, the Authority will be irreparably harmed if the grant funds are transferred and no longer in FRA's possession, while FRA will not

---

[22] FRA has suggested that no preliminary injunction is needed because applications for the money are not due until January 7, 2026, and "the closure of the application window will likely be followed by a monthslong review process. In other words, the CHSR funding will not be re-obligated for several months." Jansen Decl. ¶ 3.

face any cognizable harm if it is preliminarily enjoined from re-obligating the funds to other programs and recipients.  And there is a "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

## CONCLUSION

The Court should issue a preliminary injunction preventing Defendants from reobligating the FSP Cooperative agreement grant funds or the FY10 Cooperative agreement grant funds during the pendency of this litigation.


Dated:  October 10, 2025                    Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General




*/s/ Sharon O'Grady*
SHARON O'GRADY
CARTER JANSEN
Deputy Attorneys General
*Attorneys for Plaintiff*
*California High-Speed Rail Authority*